Kevin Budner
Phong-Chau G. Nguyen
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
ecabraser@lchb.com
kbudner@lchb.com
pgnguyen@lchb.com

David Stellings
Katherine McBride
Miranda Litwak
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
kmcbride@lchb.com

Noah Rich (State Bar No. 223441)
Roland Tellis
David Fernandes
Adam Tamburelli
Michael Dobbs
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 818.986.9698
nrich@baronbudd.com
rtellis@baronbudd.com
dfernandes@baronbudd.com
atamburelli@baronbudd.com
mdobbs@baronbudd.com

*Attorneys for Plaintiffs and the Proposed Class*
*[additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

FIRE CHIEF TRANSPORT LLC; HAPPYCAT TRANSPORT LLC; CHARLES FLOYD AND CHRISTOPHER PRICE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

DAIMLER TRUCK NORTH AMERICA LLC; DETROIT DIESEL CORPORATION; and WESTERN STAR TRUCKS SALES, INC.,

Defendants.

Case No.: 3:26-cv-01314-SB

**FIRST AMENDED CLASS ACTION ALLEGATION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS


I. INTRODUCTION .......... 5

II. THE PARTIES .......... 9

A. Plaintiffs .......... 9

B. Defendants .......... 15

III. SUBJECT MATTER JURISDICTION AND VENUE .......... 19

IV. FACTUAL ALLEGATIONS .......... 19

A. The DD15 Engine and Its Applications .......... 19

B. The DD15 Aftertreatment System .......... 21

C. DPF Damage Caused by the Defective Engine Calibration .......... 27

D. SCR Damage Caused by the Defective Engine Calibration .......... 28

E. DOC Damage Caused by the Defective Engine Calibration .......... 29

F. The Defective Engine Calibration is the Root Cause of the Aftertreatment System Damage .......... 30

G. Defendants' Misrepresentations Regarding Engine Efficiency, Aftertreatment System Reliability and Durability, and Fuel Economy .......... 32

H. DTNA Markets the Class Trucks and Facilitates Their Maintenance Services Through a Variety of Agents Who Interacted with Plaintiffs and Other Class Members .......... 38

I. The Software Reflash Will Increase Fuel Consumption and Reduce Engine Performance .......... 39

V. CLASS ACTION ALLEGATIONS .......... 41

A. Numerosity: Federal Rule of Civil Procedure 23(a)(1) .......... 43

B. Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3) .......... 43

C. Typicality: Federal Rule of Civil Procedure 23(a)(3) .......... 44

D. Adequacy: Federal Rule of Civil Procedure 23(a)(4) .......... 45

E. Declaratory and Injunctive Relief: Fed. R. Civ. P 23(b)(2) .......... 45

F. Superiority: Federal Rule of Civil Procedure 23(b)(3) .......... 45

VI. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED .......... 46

A. Discovery Rule Tolling .......... 46

B. Tolling Due to Fraudulent Concealment .......... 46

C. Estoppel .......... 47

VII. CLAIMS .......... 48

A. Claims Asserted on Behalf of the Nationwide Class .......... 48

1. NATIONWIDE COUNT I: Fraud by Concealment (Common Law) .......... 48
2. NATIONWIDE COUNT II: Unjust Enrichment (Common law) ............ 53
3. NATIONWIDE COUNT III: Breach of Implied Warranty of Merchantability (Uniform Commercial Code) ........................................ 55

B. Claims Asserted on Behalf of the State-Specific Classes .................................... 57

1. California .................................................................................... 57
   a. CALIFORNIA COUNT I: Violations of the California Unfair Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.* ........................................................................... 57
   b. CALIFORNIA COUNT II: Violations of the California False Advertising Law Cal. Bus. & Prof. Code § 17500 *et seq.* ........................................................................... 62
   c. CALIFORNIA COUNT III: Breach of Express Warranty Cal. Com. Code §§ 2313 and 10210 ............................................ 64
   d. CALIFORNIA COUNT IV: Breach of Implied Warranty of Merchantability Cal. Com. Code §§ 2314 and 10212 ................. 67
   e. CALIFORNIA COUNT V: Failure to Recall/Retrofit ................ 69
2. Kentucky ..................................................................................... 70
   a. KENTUCKY COUNT I: Breach of Express Warranty Ky. Rev. Stat. §§ 355.2-313 and 355.2A-210 (On Behalf of the Kentucky State Class) ................................................................ 70
   b. KENTUCKY COUNT II: Breach of Implied Warranty of Merchantability Ky. Rev. Stat. §§ 355.2-314 and 355.2A-212 (On Behalf of the Kentucky State Class) ............................. 73
3. Oklahoma ..................................................................................... 75
   a. OKLAHOMA COUNT I: Violations of the Oklahoma Consumer Protection Act Okla. Stat. Ann. tit. 15, § 751, *et seq.* (On Behalf of the Oklahoma State Class) ........................... 75
   b. OKLAHOMA COUNT II: Breach of Express Warranty Okla. Stat. Ann. tit. 12A, §§ 2-313 and 2A-210 (On Behalf of the Oklahoma State Class) ...................................................... 78
   c. OKLAHOMA COUNT III: Breach of Implied Warranty of Merchantability Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212 (On Behalf of the Oklahoma State Class) ............................ 81
4. Pennsylvania ................................................................................ 83
   a. PENNSYLVANIA COUNT I: Breach of Express Warranty 13 Pa. Cons. Stat. §§ 2313 and 2A210 (On Behalf of the Pennsylvania State Class) .......................................................... 83

b. PENNSYLVANIA COUNT II: Breach of Implied Warranty of Merchantability 13 Pa. Cons. Stat. §§ 2314 and 2A212 (On Behalf of the Pennsylvania State Class) ... 86

5. Texas ... 88

a. TEXAS COUNT I: Breach of Express Warranty Tex. Bus. & Com. Code §§ 2.313 and 2A.210 (On Behalf of the Texas State Class) ... 88

b. TEXAS COUNT II: Breach of Implied Warranty of Merchantability Tex. Bus. & Com. Code §§ 2.314 and 2A.212 (On Behalf of the Texas State Class) ... 91

X. REQUEST FOR RELIEF ... 93

XI. DEMAND FOR JURY TRIAL ... 94

## I. INTRODUCTION

1. This case concerns an engine calibration defect in nearly 200,000 heavy-duty diesel trucks equipped with Gen5 DD15 engines ("Class Trucks"), designed and manufactured by Defendants Daimler Truck North America LLC ("DTNA"), Detroit Diesel Corporation, and Western Star Trucks Sales, Inc. (collectively, "Defendants").[1] Specifically, the defective engine calibration in the Class Trucks reduces engine performance, which progressively and prematurely damages the aftertreatment system components that are designed to limit the production of particulate matter and harmful emissions.

2. At a high level, the defective engine calibration causes the Class Trucks to generate excessive soot. Soot or particulate matter is a tar-like substance composed of fine carbon particles that form during incomplete fuel burning in internal combustion engines.[2] That soot accumulates in the diesel particulate filter ("DPF"), a component of the truck's emissions-control system designed to capture particulate matter before it is released into the atmosphere.[3] As soot accumulates, the DPF must undergo more frequent "regeneration" cycles, during which exhaust temperatures are significantly increased to burn the accumulated soot from the filter.

3. Although regeneration is a normal feature of diesel emissions-control systems, the excessive soot generated by the defective engine calibration causes regeneration to occur far

---

[1] The Class Trucks are those equipped with model year 2021 through 2025 Gen5 DD15 engines (model 472.912), produced between January 15, 2020, and February 21, 2025.

[2] Minimizing soot generation and removing soot from the exhaust stream are particularly problematic for diesel engines. *See* Amsoil, *Engine Soot: It's Harmful Effects & How to Prevent*, performanceoiltechnology.com/amsoil-resources/the-harmful-effects-of-engine-soot, last viewed May 13, 2026.

[3] Daimler Truck North America, *Field Service Campaign D25M3-2025 HDEP MCM Software Reprogramming*, July 22, 2025, *available at* https://static.oemdtc.com/NHTSA-PDFs/MC-11027201-0001.pdf, p. 1 ("DETROIT® has found Diesel Particulate Filter failures due to excessive temperatures occurring from faster than expected particulate matter [soot] buildup.").

more frequently and longer than is necessary. This, in turn, subjects the DPF, the selective catalytic reduction ("SCR") catalyst, the diesel oxidation catalyst ("DOC") and related aftertreatment components to excessive heat and thermal stress that accelerate their degradation. These excessively frequent regeneration events also create safety hazards by increasing the risk of fires during parked regeneration and, in severe cases, engine fires caused by excessively clogged DPFs.

4. The defective engine calibration has also caused and will continue to cause economic harm to owners of the Class Trucks. Their economic losses include frequent and costly DPF cleanings and replacements, increased downtime, reduced vehicle reliability, accelerated aging of the DPFs, SCRs, DOCs, and related aftertreatment components, and out-of-pocket repair expenses for damaged aftertreatment components.

5. Recognizing there was a problem with the engine calibration, on July 22, 2025, DTNA initiated Field Service Campaign D25M3 (the "Campaign"), which applies to nearly 200,000 Class Trucks.[4] Through the Campaign, Defendants admitted that the DPF failures in Class Trucks were caused by unexpected, accelerated particulate matter buildup within the DPFs and excessively frequent high-temperature regeneration cycles.

6. The Campaign attempts to address the defective engine calibration through reprogramming (a "reflash") of the Motor Control Module ("MCM"), including modifications to engine fuel maps intended to reduce the rate of soot accumulation and regeneration-related

[4] The reflash was revised in December 2025 purportedly to address some software "bugs" that were causing unwanted secondary issues. *See* DTNA, *DDC D25M3-Reactivated and Revised Bulletin*, December 15, 2025, *available at* https://static.oemdtc.com/NHTSA-PDFs/MC-11027202-0001.pdf.

thermal stresses imposed on the aftertreatment system.[5] However, Defendants' proposed remedy fails to address the cumulative degradation and premature aging already suffered by the DPFs, SCRs, DOCs, and related aftertreatment components before implementation of the MCM reflash and does not compensate Plaintiffs for excessively frequent and costly cleanings of the DPFs.

7. Critically, the Campaign does not require dealers to replace the DPFs or even to inspect them for thermal fatigue, degradation of the DPFs' filter element ("substrate"), or filter cracking that may already have occurred after prolonged operation under the defective engine calibration. Because the DPF filter substrate is enclosed within a metal housing, owners cannot readily determine whether the filter elements have been damaged or compromised. Even where owners possess the technical ability to remove and disassemble a DPF for inspection, the process requires substantial labor and expensive replacement of associated clamps, gaskets, and seals before the DPF can be reassembled and reinstalled.

8. Additionally, Defendants' proposed remedy fails to address accelerated aging of and degradation to the DPFs, SCRs, DOCs, and related aftertreatment components resulting from excessively frequent regeneration cycles over several years of vehicle operation. While the MCM reflash may reduce regeneration frequency going forward, the Campaign does not account for the extent of the damage already caused by excessive soot generation or provide compensation for DPFs, SCRs, DOCs, and related aftertreatment components that have already suffered premature degradation, thermal fatigue, cracking of catalyst substrates, or other damage warranting replacement.

---

[5] *Field Service Campaign D25M3* ("Updated programming of the Motor Control Module (MCM) will correct this issue" by modifying fuel maps).

9. The updated MCM fuel maps also raise concerns regarding potential impacts to performance and operating metrics that were material to purchasers of the Class Trucks. Upon information and belief, the revised calibrations adversely affect DD15 engine responsiveness, torque delivery, horsepower, acceleration, DEF consumption, and other performance characteristics. The revised calibrations also adversely affect the Class Trucks' fuel economy, meaning that Plaintiffs and members of the proposed classes face increased operating costs. For obvious reasons, operating costs generally, and fuel costs specifically, are of utmost importance to businesses operating long-haul vehicles like the Class Trucks.

10. Defendants failed to disclose any of these operational and economic tradeoffs associated with the reflash and provide no compensation for any resulting increase in fuel or other operating costs.

11. Defendants could and should have identified the defective engine calibration and the resulting harm to the aftertreatment system years before acknowledging elevated DPF failure rates through the Campaign. Using standard engineering validation processes, including modeling and simulation tools, engine and aftertreatment dynamometer testing, and reliability, durability and road validation testing, would have revealed that excessive soot generation was resulting in excessively frequent regeneration cycles that imposed stresses on the DPFs, SCRs, DOCs, and related aftertreatment components.

12. Plaintiffs bring this action on behalf of themselves and all others similarly situated to recover damages caused by Defendants' defective Gen5 DD15 engines in Class Trucks and inadequate remedy, and to obtain injunctive relief compelling Defendants to fully remedy the defect.

## II. THE PARTIES

### A. Plaintiffs

**Plaintiff Fire Chief Transport LLC**

13. Plaintiff Fire Chief Transport LLC is a California Limited Liability Company with its principal place of business located in Claremont, California. Plaintiff owns the following Class Truck: 2024 Western Star 57X Chassis Truck-Tractor. Plaintiff purchased the Class Truck used from Premier Truck Group of Dallas in October 2025. The Class Truck is principally based in California.

14. Plaintiff decided to purchase the Class Truck in part because of Defendants' representations regarding engine performance, fuel economy, after-treatment system reliability and durability, reduced regeneration frequency, safety, and low operating costs. During the three months prior to purchasing the Class Truck, Tim Dunfee, acting on Plaintiff's behalf, did extensive research into the various heavy-duty truck options and frequently viewed videos and other marketing materials on the websites of Defendants Detroit Diesel and Western Star. Mr. Dunfee is the sole owner of Fire Chief Transport LLC and conducted this research and reviewed these materials while in California, his state of residence. He specifically viewed claims that the Class Truck, powered by the Gen5 DD15 engine, would enjoy a 3% increase in fuel efficiency and require fewer and shorter active regeneration cycles because of new and improved engine and aftertreatment features. He also was motivated to purchase the Class Truck because of Detroit Diesel's general reputation for producing reliable and durable engines and because the DD15 and aftertreatment system were covered by extensive warranties. Mr. Dunfee communicated with Premier Truck Group of Dallas concerning Plaintiff's purchase of the Class Truck by telephone and email while he was in California. While in California, Mr. Dunfee relied on these representations and decided, on Plaintiff's behalf, to purchase the Class Truck from

Premier Truck Group of Dallas. At the time of purchase, Plaintiff did not know, and had no reasonable way of knowing, that its Class Truck was originally sold with a defective engine calibration that caused excessive soot generation, unnecessarily frequent regeneration events, accelerated degradation of the DPF, SCR, DOC, and related aftertreatment components, increased operating costs, additional safety risks, and fuel efficiency that would be reduced by the Field Service Campaign.

15. Defendants' misrepresentations and omissions were material to Plaintiff's purchasing decision. Had Plaintiff known the true nature of the defect and its consequences, Plaintiff would not have purchased the Class Truck or would have paid substantially less for it. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered economic injury, including overpayment at the point of sale, premature degradation and reduced useful life of the DPF, SCR, DOC, and related aftertreatment components, and increased operating costs associated with the defect and Defendants' inadequate remedy.

16. Plaintiff did not receive notice that its Class Truck required Field Service Campaign D25M3.

**Plaintiff Happycat Transport LLC**

17. Plaintiff Happycat Transport LLC is a Wyoming Limited Liability Company with its principal place of business located in Allentown, Pennsylvania. Plaintiff owns the following Class Truck: 2022 Western Star 5700 Truck-Tractor. Plaintiff purchased the Class Truck used from TAG Truck Center in Calvert City, Kentucky in approximately February 2026. The Class Truck is principally based in Pennsylvania.

18. Plaintiff decided to purchase the Class Truck in part because of Defendants' representations regarding engine performance, fuel economy, after-treatment system reliability

and durability, reduced regeneration frequency, safety, and low operating costs. Because of the considerable investment, Michael Bristol, acting on Plaintiff's behalf, did extensive research prior to purchasing the Class Truck including visiting the Western Star website on multiple occasions. Mr. Bristol is the sole owner of Happycat Transport LLC and conducted this research and reviewed these materials while in Pennsylvania, his state of residence. Mr. Bristol noticed that the marketing claims and presentations on that website were similar to those he saw on the websites of the other Defendants. Defendants' claims that Plaintiff's Class Truck achieved superior fuel efficiency were a key factor in the purchase, as were Defendants' claims that the truck and its engine were very reliable, durable, powerful, and required less frequent engine-related maintenance than other heavy-duty trucks. Mr. Bristol communicated with TAG Truck Center concerning Plaintiff's purchase of the Class Truck by telephone while he was in Pennsylvania. While in Pennsylvania, Mr. Bristol relied on these representations and decided, on Plaintiff's behalf, to purchase the Class Truck from TAG Truck Center. At the time of purchase, Plaintiff did not know, and had no reasonable way of knowing, that its Class Truck was originally sold with a defective engine calibration that caused excessive soot generation, unnecessarily frequent regeneration events, accelerated degradation of the DPF, SCR, DOC, and related aftertreatment components, increased operating costs, additional safety risks, and fuel efficiency that would be reduced by the Field Service Campaign.

19. Defendants' misrepresentations and omissions were material to Plaintiff's purchasing decision. Had Plaintiff known the true nature of the defect and its consequences, Plaintiff would not have purchased the Class Truck or would have paid substantially less for it. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered economic injury, including overpayment at the point of sale, premature degradation and reduced useful life of the

DPF, SCR, DOC, and related aftertreatment components, and increased operating costs associated with the defect and Defendants' inadequate remedy.

20. Plaintiff did not receive notice that its Class Truck required Field Service Campaign D25M3.

**Plaintiff Charles Floyd**

21. Plaintiff Charles Floyd resides in North Hollywood, California. Plaintiff owns the following Class Truck: 2024 Freightliner Cascadia. Plaintiff purchased the Class Truck used from Premier Truck Group of Oklahoma City, OK, in approximately March 2026. The Class Truck is principally based in California.

22. Plaintiff decided to purchase the Class Truck in part because of Defendants' representations regarding engine performance, fuel economy, after-treatment system reliability and durability, reduced regeneration frequency, safety, and low operating costs. Because of the considerable investment, Plaintiff did extensive research prior to purchasing his Class Truck, including visiting Freightliner and Daimler websites on multiple occasions and downloading brochures from those websites. Plaintiff conducted this research and reviewed these materials while in California. He recalls seeing representations that his Class Truck's fuel efficiency had been increased by 3%, that the Gen5 DD15 was more durable and reliable than other heavy-duty engines, and that his Freightliner's diesel particulate filters would require less frequent cleanings. He also spoke on the phone with a representative of Premier Truck Group regarding the truck's reliability, standard and extended warranties, and fuel efficiency. Plaintiff was in California during that conversation and during his other telephone and email communications with Premier Truck Group of Oklahoma City concerning the purchase of the Class Truck.

23. Defendants' claims that Plaintiff's Class Truck achieved superior fuel efficiency were a key factor in the purchase as well as Defendants' claims that the truck and its engine were very reliable, durable, powerful, and required less frequent engine-related maintenance than other heavy-duty trucks. While in California, Plaintiff relied on these representations and decided to purchase the Class Truck from Premier Truck Group of Oklahoma City. At the time of purchase, Plaintiff did not know, and had no reasonable way of knowing, that his Class Truck was originally sold with a defective engine calibration that caused excessive soot generation, unnecessarily frequent regeneration events, accelerated degradation of the DPF, SCR, DOC, and related aftertreatment components, increased operating costs, additional safety risks, and fuel efficiency that would be reduced by the Field Service Campaign.

24. Defendants' misrepresentations and omissions were material to Plaintiff's purchasing decision. Had Plaintiff known the true nature of the defect and its consequences, Plaintiff would not have purchased the Class Truck or would have paid substantially less for it. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered economic injury, including overpayment at the point of sale, premature degradation and reduced useful life of the DPF, SCR, DOC, and related aftertreatment components, and increased operating costs associated with the defect and Defendants' inadequate remedy.

25. Plaintiff did not receive notice that his Class Truck required Field Service Campaign D25M3.

**Plaintiff Christopher Price**

26. Plaintiff Christopher Price resides in Houston, Texas. Plaintiff is leasing the following Class Truck: 2025 Freightliner Cascadia. Plaintiff leased the Class Truck used from SFI Trucks and Financing in June 2026. The Class Truck is principally based in Texas.

27. Plaintiff decided to lease the Class Truck in part because of Defendants' representations regarding engine performance, fuel economy, after-treatment system reliability and durability, reduced regeneration frequency, safety, and low operating costs. Because of the considerable investment, Plaintiff did extensive research prior to leasing his Class Truck, including visiting DTNA's and Freightliner's websites. Plaintiff conducted this research and reviewed these materials while in Texas. He recalls seeing representations that his Class Truck's fuel efficiency had been increased compared to the Gen4 DD15 engine, that the Gen5 DD15 was more technologically advanced than other heavy-duty engines and offered better warranty coverage, and that it would require fewer active and parked regeneration cycles.

28. Plaintiff also visited a Freightliner dealership in Houston, Texas, and a Freightliner dealership in Effingham, Illinois. At both dealerships, he spoke in person with representatives who told him that his Class Truck's DD15 engine was more fuel efficient because of its newer technology and had an improved aftertreatment system compared to the Gen4 DD15 engine. These representatives told Plaintiff that the aftertreatment system required fewer parked regeneration cycles and less frequent and lengthy active regeneration cycles. These representatives also told Plaintiff that previous issues with the Gen4 DD15 engine's aftertreatment system had been remedied, increasing reliability and lowering operating costs. Plaintiff also recalls speaking with a sales representative at the Illinois dealership about how the aftertreatment system performs better in cold weather.

29. Plaintiff also had numerous conversations with representatives of the Freightliner dealership in Oak Creek, Wisconsin, while he was in Texas. Those conversations concerned the Gen5 DD15's new technology, improved aftertreatment system, and reduced active regeneration

frequency and duration. An Oak Creek representative also emphasized the warranty coverage offered on the Gen5 DD15.

30. Defendants' representations described above were key factors in Plaintiff's decision to lease his Class Truck. Plaintiff relied on these representations, including the website representations he reviewed and telephone conversations he had while in Texas. Plaintiff made his decision to lease the Class Truck while in Texas. At the time of lease, Plaintiff did not know, and had no reasonable way of knowing, that his Class Truck was originally offered with a defective engine calibration that caused excessive soot generation, unnecessarily frequent regeneration events, accelerated degradation of the DPF, SCR, DOC, and related aftertreatment components, increased operating costs, additional safety risks, and fuel efficiency that would be reduced by the Field Service Campaign.

31. Defendants' misrepresentations and omissions were material to Plaintiff's leasing decision. Had Plaintiff known the true nature of the defect and its consequences, Plaintiff would not have leased the Class Truck or would have leased the Truck at lower payments. As a direct and proximate result of Defendants' misconduct, Plaintiff suffered economic injury, including overpayment at the point of lease, premature degradation and reduced useful life of the DPF, SCR, DOC, and related aftertreatment components, and increased operating costs associated with the defect and Defendants' inadequate remedy.

32. Plaintiff did not receive notice that his Class Truck required Field Service Campaign D25M3.

**B. Defendants**

33. Defendant **Daimler Truck North America LLC** ("DTNA") is a Delaware limited liability company with its principal place of business located at 4555 N. Channel Avenue, Portland, OR 97217. DTNA is one of the largest manufacturers of commercial vehicles in North

America and is engaged in the business of designing, engineering, manufacturing, marketing, distributing, and selling heavy-duty trucks throughout the United States. DTNA publicly identifies the Freightliner, Western Star, and Detroit brands as part of its business of designing, engineering, manufacturing, and marketing commercial vehicles and associated technologies and components. DTNA's Detroit brand includes diesel engines and other powertrain components used in Freightliner and Western Star trucks, including the DD-series engines. DTNA conducts marketing activities for Freightliner and Western Star trucks and Detroit components through personnel based in Portland, Oregon, as detailed below.

34. Defendant **Detroit Diesel Corporation** ("Detroit Diesel") is a Delaware corporation with its principal place of business located at 13400 Outer Drive West, Detroit, MI 48239. Detroit Diesel is a subsidiary of DTNA and designs, develops, manufactures, and sells diesel engines for use in commercial trucks, including the Gen5 DD15 engines (model 472.912) at issue in this action. On information and belief, Detroit Diesel also conducts product integrity, regulatory compliance, and aftersales procurement activities through Portland-based leadership with responsibilities for both Detroit Diesel and DTNA, as described below. Detroit Diesel directs its parts and services to Oregon through its parts and distribution network for installation and use in Class Trucks.[6] Detroit Diesel boasts that "[w]ith 11 strategically located Parts Distribution Centers (PDCs) throughout North America and more than 900 dealer and retail

---

[6] Detroit Diesel Corporation, *Oregon Dealers*, available at https://www.demanddetroit.com/dealer-search/united-states/oregon/, last visited June 9, 2026; Detroit Diesel Corporation, *United States Dealers*, available at https://www.demanddetroit.com/dealer-search/united-states/, last visited June 9, 2026.

locations stocking Detroit parts, customers can easily access the components they need — when and where they need them."[7]

35. Defendant **Western Star Trucks Sales, Inc.** ("Western Star") is a Washington corporation with its principal place of business located at 4555 N. Channel Avenue, Portland, OR 97217. Western Star is a wholly owned subsidiary of DTNA. Western Star is engaged in the business of designing, manufacturing, marketing, distributing, and selling heavy-duty trucks throughout the United States. Vehicles manufactured by Western Star are powered by DD15 engines manufactured by Detroit Diesel and are among the Class Trucks affected by the defective engine calibration.

36. DTNA's Portland-based marketing leadership directs the promotion of Freightliner and Western Star trucks and Detroit components. For example, since April 2023, Greg Treinen has served as DTNA's Vice President of On Highway Market Development in Portland, Oregon. His responsibilities include positioning and promoting Freightliner and Western Star on-highway products and overseeing product marketing, training, and Detroit components marketing teams. From September 2019 through April 2023, Mr. Treinen served as DTNA's Product Marketing Manager for Heavy Vocational products in Portland. In that position, he led teams developing launch strategies, marketing messages, brand communications, and dealer training for Western Star 49X and 47X trucks and Freightliner Plus Series products.

37. DTNA and Detroit Diesel also share product integrity and regulatory compliance leadership. Sean Waters identifies Portland, Oregon as his location and describes his product integrity responsibilities as encompassing both DTNA and Detroit Diesel. Since January 2024,

---

[7] Detroit Diesel Corporation, *Our Company*, available at https://www.demanddetroit.com/our-company, last visited June 9, 2026.

Mr. Waters has held the position of Vice President of Product Integrity and Government Affairs at DTNA. From November 2019 through January 2024, he served as Vice President of Product Compliance and Regulatory Affairs in the Portland metropolitan area. Previously, from July 2011 through November 2019, Mr. Waters served as Director of Product Compliance and Regulatory Affairs. His responsibilities in that director position included emissions and safety compliance, emissions certification, government reporting and investigations, and safety and emissions defect investigations for DTNA, Detroit Diesel, and their subsidiaries. In this role, he also served on DTNA's Recall Review and Advisory Committee, Detroit Diesel's Product Problem Evaluation Committee, and the companies' Product Safety Committees.

38. DTNA's Portland-based purchasing operations have also supported Detroit Diesel's aftersales business. In February 2018, Parker Warren became DTNA's Director of Aftermarket Purchasing, based in Portland, Oregon. His responsibilities included managing purchasing staff comprising two teams in Portland and a remote team in Detroit, implementing procurement strategies for global aftermarket and powertrain products, and working with supplier management to assure supply for both "DTNA and DDC aftersales." Mr. Warren also identifies Portland as the location of his Director of Procurement and Supply for Truck Cab and Chassis position, which began in March 2022. That position includes responsibility for strategic procurement and supply of Freightliner and Western Star chassis and cabin components.

39. Defendants are jointly and severally liable for the acts and omissions alleged herein. Each Defendant acted as the agent, servant, partner, joint venturer, and/or alter ego of each of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Defendants worked together in the design, marketing and sale of the Class

Trucks, and are intimately aware of their divisions of labor and responsibilities therein. Each Defendant ratified, approved, and/or authorized the wrongful acts of the other Defendants.

## III. SUBJECT MATTER JURISDICTION AND VENUE

40. This Court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because some members of the proposed Classes are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

41. Furthermore, this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

42. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in this District, and because Defendants have caused harm to Class members residing in this District. Defendants have marketed, advertised, sold, and leased the Class Trucks from authorized dealers located in this District, such as Freightliner Northwest.

## IV. FACTUAL ALLEGATIONS

### A. The DD15 Engine and Its Applications

43. Defendant DTNA designs and manufactures the Gen5 DD15 engine, a 6-cylinder, 14.8-liter diesel engine, through its subsidiary, Detroit Diesel. First introduced in 2007, the DD15 is widely used in Freightliner and Western Star trucks. The engine powers a variety of commercial vehicles, including Class 8 long-haul trucks and large motorcoaches that operate under demanding conditions, such as sustained highway driving and heavy-load hauling. The DD15 engine, and some of the trucks in which it is installed, are depicted below.

**<u>DD15 Gen 5 Engine[8]</u>**




**<u>Freightliner Cascadia</u>**



[8] Detroit Diesel Corporation, *Detroit DD15® Engine*, available at http://www.demanddetroit.com/engines/dd15, last visited June 5, 2026.

**Western Star Heavy Duty Truck**




**B. The DD15 Aftertreatment System**

44. The DD15 engine uses an emissions-control aftertreatment system designed to reduce, capture, and eliminate harmful gaseous emissions and particulate matter generated during combustion. [9] The aftertreatment system consists of three principal components[10]:

a. A **diesel oxidation catalyst** or "**DOC**." The DOC is a catalytic converter that converts certain harmful and regulated emissions, such as carbon monoxide and hydrocarbons into less harmful pollutant emissions, such as

[9] Modern heavy-duty diesel aftertreatment systems are designed to reduce multiple categories of emissions, including oxides of nitrogen ("NOx"), nitrous oxide ("$N_2O$"), carbon monoxide, hydrocarbons, and particulate matter ("soot"). Particulate matter is a powdery black substance that is formed when carbon in the diesel fuel is not completely combusted in the engine's cylinders.

[10] Detroit Diesel Corporation, *DD Heavy Duty Platform Operators Manual (Models: DD13, DD15, DD16)*, revised March 5, 2024, *available at* dtnacontent-dtna.prd.freightliner.com/content/dam/public/dtna-servicelit/ddc/pdfs/OperatorsManual/DDPlatform/DDC-SVC-MAN-0189_2025, p. 92.

carbon dioxide and water vapor.[11] The DOC also plays a key role during active regeneration by oxidizing diesel fuel injected into the exhaust stream to raise exhaust temperature high enough to remove stored soot from the diesel particulate filter;

b. A **diesel particulate filter** or "**DPF**." The DPF captures and stores soot particles generated during diesel engine operation in a porous ceramic or cordierite substrate.[12] Because the DPF has a finite soot-storage capacity, accumulated soot must periodically be burned into ash through a process known as "regeneration,"[13] discussed further below; and

c. A **selective catalytic reduction** or "**SCR**." The SCR removes oxides of nitrogen through the injection of diesel exhaust fluid ("DEF"). Ammonia contained in the DEF reacts with NOx in the presence of the SCR catalyst to convert NOx into nitrogen and water.[14]

45. In the Class Trucks, the DOC, DPF, and SCR are integrated into a compact "One-Box" aftertreatment system (shown below) designed to reduce emissions while minimizing space and weight.[15] The One-Box also contains components associated with the DEF storage and delivery system, together with temperature, pressure, and gas concentration sensors used to control aftertreatment system performance.

---

[11] Detroit Diesel Corp., *Detroit After-treatment Support*, *available at* https://www.demanddetroit.com/parts-service/Detroit-genuine-parts-program/aftertreatment-support, last viewed June 5, 2026.

[12] Environmental Protection Agency, *Diesel Particulate Filter General Information* (EPA-420-10-029), May 2010, *available at* https://www.epa.gov/sites/default/files/2016-03/documents/420f10029.pdf.

[13] *Detroit After-Treatment Support*.

[14] *Id.*

[15] *Id.*; *DD Heavy Duty Platform Operators Manual*, pp. 88-92.

**DD 15 One-Box Aftertreatment System Assembly**[16]



**DD 15 Aftertreatment System Component Architecture**[17]




46. As shown above, exhaust gases leaving the engine first pass through the DOC, where catalytic reactions convert certain harmful emissions into less harmful compounds. The

[16] *Id.*

[17] *Detroit After-Treatment Support*. Note that the One-Box houses two DOCs and two DPFs.

exhaust gases then pass through the DPF, which captures soot particles while allowing exhaust gases to continue flowing through the aftertreatment system. After exiting the DPF, the exhaust enters the SCR, where ammonia supplied through the DEF system converts NOx emissions into nitrogen and water. The aftertreatment system is monitored and controlled by an electronic control module known as the Aftertreatment Control Module ("ACM"), which uses data from various sensors to regulate system performance and emissions levels.

47. As alleged above, the DPF is designed to capture particulate matter, commonly referred to as soot, generated during diesel engine operation. Soot forms when diesel fuel does not completely combust within the engine's cylinders. The DPF contains a ceramic honeycomb filter ("substrate") with thousands of narrow channels and microscopic pores that allow exhaust gases to pass through while trapping soot within the filter structure.

48. The DD15's DPF has a finite soot-storage capacity. As soot accumulates, exhaust flow becomes increasingly restricted, creating backpressure within the aftertreatment system and causing the engine to work harder to expel exhaust gases out the tailpipe. To monitor soot accumulation, the ACM uses pressure sensors and soot accumulation models to estimate the amount of soot trapped within the DPF. Once soot loading reaches elevated levels, measured as a percentage of its full capacity, the accumulated soot must be removed through regeneration.[18]

49. The DD15's aftertreatment system uses both passive and active regeneration to remove accumulated soot from the DPF.[19] Passive regeneration occurs without driver action during sustained higher-temperature operating conditions, such as highway driving or heavy-load operation, when elevated exhaust temperatures naturally oxidize or burn soot within the DPF

[18] *DD Heavy Duty Platform Operators Manual*, p. 92; *Detroit After-Treatment Support*.
[19] *Detroit After-Treatment Support*.

without further action needed from the vehicle or driver.[20] During passive regeneration, exhaust temperature does not rise to levels that can result in significant thermal stress to the DPF or degradation of the SCR's catalyst.

50. When passive regeneration is insufficient and soot loading continues to increase, active regeneration is initiated. During active regeneration, the Motor Control Module ("MCM") injects additional fuel into the exhaust stream. That fuel oxidizes within the DOC, substantially increasing exhaust and DPF temperatures in order to burn accumulated soot from the filter. As soot accumulation increases, active regeneration cycles become more frequent.

51. If soot loading continues to rise to critically high levels (*i.e.* 80% to 90% of maximum design capacity), drivers are instructed through dashboard warnings to stop their vehicles in a safe location and manually initiate a stationary or "parked" regeneration cycle. Parked regenerations can last from approximately twenty minutes to over an hour, excluding the additional time required for drivers to leave their route, locate an appropriate and safe location, complete the regeneration process, and return the truck to service. If parked regeneration is not performed, the DD15 may enter into a reduced-power or "limp" mode. In severe cases, soot loading may become so excessive that regeneration can no longer be safely performed, requiring the vehicle to be towed so the DPF can be removed, cleaned, or replaced.

52. DPF soot loading can rise to levels that impact the safety of the driver, the truck, and the areas where parked regenerations occur. For example, the very high DPF temperatures reached during parked regeneration can result in the combustion of dry grass, leaves, and other

---

[20] *See* Perkins, UK, *Passive Regeneration in a DPF*, available at http://www.perkins.com/en_GB/products/emissions-technology/passive-regeneration.html, last visited May 12, 2026; *Aftertreatment Support* webpage.

combustible debris located near the truck.[21] The intense heat—up to 1500 degrees Fahrenheit—generated during automatic active regeneration events can also ignite a truck's hydraulic lines, electrical wiring, or fuel lines.[22] In some cases, DPFs that become excessively saturated with soot can experience a "runaway" regeneration event and combust. In rare instances, the elevated backpressure associated with severely clogged DPFs can result in engine fires.[23]

**<u>Regeneration-Related Warnings for Cascadia Trucks</u>**[24]



manufacturer. See your engine operation manual for complete details. Both active and passive regen happen automatically, without driver input.

**⚠ WARNING**

**Active regeneration can occur automatically anytime the vehicle is moving. The exhaust gas temperature could reach 1500°F (800°C), which is hot enough to cause a fire, heat damage to objects or materials, or personal injury to persons near the exhaust outlet. The exhaust temperature can remain high even after the vehicle has stopped. When stopping the vehicle shortly after an automatic regen, ensure the exhaust outlets are directed away from structures, vegetation, flammable materials, and anything else that may be harmed by exposure to high heat.**

**See *Regen Switches*, below, for instructions on preventing automatic regen if necessary.**

When operating conditions do not allow for ATD filter cleaning by active or passive regen, the vehicle may require a driver-activated **parked regen**. When this occurs, the DPF lamp illuminates, indicating that a regen is required. The driver must either bring the vehicle up to highway speed to increase the load (thus starting an active regen), or park the vehicle and initiate a parked regen. See *Regen Switches*, below, for instructions on initiating a parked regen.



**Fig. 12.1, Regen Request and Inhibit Switches**

**⚠ WARNING**

**During parked regen, exhaust temperatures are very high and could cause a fire, heat damage to objects or materials, or personal injury to persons near the exhaust outlet.**

**Before initiating a parked regeneration, make certain the exhaust outlets are directed away from structures, vegetation, flammable materials, and anything else that may be harmed by prolonged exposure to high heat.**

To initiate a parked regen, perform the following steps.

1. Park the vehicle away from all flammable materials, put the transmission in neutral, and set the parking brake.
2. Start and warm the engine until the coolant temperature is at least 150°F (66°C).

---

[21] Daimler Truck North America, *Cascadia Driver's Manual*, *available at* https://dtnacontent-dtna.prd.freightliner.com/content/dam/public/dtna-servicelit/dtna/pdfs/en_us/freightliner/drivers-manuals/Cascadia%20Driver's%20Manual_pdf, p. 12.2 ("During parked regen, exhaust temperatures are very high and could cause a fire, heat damage to objects or materials, or personal injury to person near the exhaust outlet. Before initiating a parked regeneration, make certain the exhaust outlets are directed away from structures, vegetation, flammable materials, and anything else that may be harmed by prolonged exposure to high heat.").

[22] *Id.* ("Active regeneration can occur automatically anytime the vehicle is moving. The exhaust gas temperature could reach 1500F (800C) which is hot enough to cause a fire, heat damage to objects or materials, or personal injury to person near the exhaust outlet.").

[23] *See* Work Safe BC, *Risk Advisory: Explosion or fire from diesel particulate filter (DPF) systems*, *available at* https://www.worksafebc.com/en/resources/health-safety/risk-advisory/explosion-or-fire-from-diesel-particulate-filter-dpf-systems, January 2015, last viewed June 6, 2026.

[24] *See Cascadia Driver's Manual*, p. 12-2.

53. Beyond the safety concerns associated with excessively high soot loading and regeneration temperatures, unnecessarily frequent regeneration events increase the thermal and chemical stresses imposed on the aftertreatment system. As discussed below, the defective engine calibration in the Class Trucks causes regeneration to occur more frequently than intended, accelerating degradation of the DPF, the SCR, the DOC, and related aftertreatment components such as temperature and NOx sensors.

54. Regeneration reduces accumulated soot from the DPF but leaves residual ash that gradually builds up within the DPF over time. Eventually, the DPF must be removed from the One-Box and professionally cleaned or replaced. Cleaning and replacement procedures are costly and operationally disruptive. Cleaning costs can range from several hundred to over a thousand dollars. Because the defective engine calibration increases soot accumulation and regeneration frequency, owners of the Class Trucks have been forced to clean and sometimes replace their DPFs more frequently than would otherwise be necessary. Likewise, replacement of heavily ash-loaded or damaged DPFs can cost several thousand dollars.

## C. <u>DPF Damage Caused by the Defective Engine Calibration</u>

55. As previously explained, the defective engine calibration causes the DD15 engines to generate excessive soot. The excessive soot accumulation within the DPF increases both the frequency and duration of high-temperature regeneration cycles, including automatic active regeneration and manual stationary or parked regeneration events.[25] As regeneration frequency increases, the DPF is exposed to elevated temperatures and repeated thermal cycling far more often than would occur during properly calibrated engine operation. Over time, the

[25] EPA, *Particulate Filter General Information* ("An engine emitting excessive P[articulate] M[atter] . . . will cause a DPF to require more frequent" regeneration cycles and cleanings.).

cumulative effects of this repeated heat exposure and thermal stress degrade the DPF filter substrate, accelerate DPF aging, and shorten the useful life of the DPF.[26]

56. The damage caused by excessive regeneration cycles is cumulative. Defendants themselves acknowledged the risk of progressive DPF damage in Field Service Campaign D25M3. DTNA warned that "[o]wners may be liable for any progressive damage that results from failure to complete campaigns within a reasonable time after receiving notification."[27] The Campaign's "Copy of Notice to Owners" similarly warned that "DTNA highly recommends having the campaign completed as soon as possible. To avoid incurring additional downtime and expenses from progressive damages please complete . . . in a timely manner."[28] Defendants' own Field Service Campaign warnings confirm that continued operation with the defective engine calibration results in ongoing and progressive damage to the aftertreatment system.

### D. SCR Damage Caused by the Defective Engine Calibration

57. The SCR reduces NOx emissions by using ammonia contained in the diesel exhaust fluid to convert oxides of nitrogen into harmless compounds. The SCR contains a catalytic substrate that facilitates this chemical conversion and is a critical component of the DD15's aftertreatment system.

58. Because the SCR is located downstream from the DPF within the DD15's One-Box aftertreatment system, it is exposed to the elevated temperatures generated during active and parked regeneration events. Excessively frequent regeneration cycles subject the SCR to repeated

---

[26] For illustration purposes, the thermal cycle during an active regeneration generally starts at typical exhaust temperatures of about 550-800 degrees Fahrenheit, increases to 1100-1500 degrees during the regeneration period, and then returns to 550-800 degrees after the regeneration is complete.

[27] *See Field Service Campaign D25M3*, p. 1.

[28] *See id.* at 4.

thermal cycling and elevated temperatures that accelerate aging and degradation of the SCR catalyst. The same excessive regeneration events also increase thermal and chemical stresses on related aftertreatment components located within the One-Box system.

59. Excessively frequent high-temperature regeneration cycles can degrade the SCR's ability to convert NOx into nitrogen and water. As regeneration frequency and temperatures increase, the cumulative thermal stress accelerates aging of the SCR catalyst and shortens the component's useful service life. In the worst instances, extremely high temperatures can cause the SCR's substrate to melt or for the catalyst to flake away from the SCR's interior walls.

60. As a result, the defective engine calibration subjects the SCRs in the Class Trucks to accelerated aging and degradation beyond what would occur under properly calibrated engine operation. Excessively frequent regeneration cycles similarly accelerate wear and degradation of related aftertreatment components exposed to elevated temperatures and repeated thermal cycling.[29]

**E. <u>DOC Damage Caused by the Defective Engine Calibration</u>**

61. Like the DPF and SCR, the excessively frequent high-temperature regeneration events also degrade the durability and performance of the DOC. The DOC is the first catalyst that the stream of engine exhaust encounters when leaving the cylinders. The DOC's primary function is to convert carbon monoxide and unburned hydrocarbons into harmless carbon dioxide and water vapor.

62. The DOC's secondary function is to elevate exhaust temperature during active regeneration to levels required to burn the soot trapped in the DPF into ash. It does this by converting the chemical energy contained in raw fuel that is introduced into the exhaust stream

---

[29] How the NOx conversion efficiency, or performance, of an SCR degrades over time is measured by deterioration factor ("DF") testing and reported to emissions regulators.

into intense heat. Oxidation occurs when finely atomized diesel fuel passes through the DOC's micro-porous catalytic substrate and reacts with precious metals that coat the substrate's walls. The DOC is the hottest spot in the aftertreatment system during active regeneration events and thermal gradients up to 150°C to 200°C can build up between the inlet and the outlet of the DOC.

63. As with the DPF and the SCR, excessively frequent regeneration cycles degrade the structural integrity, longevity, and performance of the DOC's substrate and precious metal catalyst.

64. Additionally, the excessive soot caused by the defective engine calibration can lead to "face-plugging" of the DOC where unburned fuel builds up on the DOC's inlet. Face-plugging can result in extreme exhaust backpressure and possible engine damage, cripple the DOC's ability to remove carbon monoxide and unburned fuel from the exhaust stream, and prevent the proper performance of active regeneration cycles, thereby eventually subjecting the DPF to unsafe levels of soot loading.

**F. <u>The Defective Engine Calibration is the Root Cause of the Aftertreatment System Damage</u>**

65. Defendants' Campaign materials indicate that the problem originates in the DD15's engine control software calibrations and fuel-mapping strategy, rather than from ordinary wear and tear of the aftertreatment system. Defendants' chosen remedy—a reflash of the MCM software with revised fuel maps—demonstrates that Defendants identified the defective engine calibration as a significant contributor to the excessive soot accumulation, unnecessarily frequent regeneration cycles, and resulting damage to the aftertreatment system.

The revised engine calibration is intended to reduce the rate of soot accumulation and the thermal stress associated with excessive regeneration cycles.[30]

66. Defendants' Field Service Campaign is inadequate because it does not address damage and degradation already sustained by the Class Trucks' DPFs, SCRs, DOCs, and related aftertreatment components during the years of operation under the defective engine calibration. The Campaign modifies only the engine calibration in an effort to reduce future soot accumulation and regeneration frequency. It does not provide for inspection of the DPFs, SCRs, or DOCs to evaluate thermal fatigue damage, substrate or catalyst degradation, cracking, excessive ash accumulation, or other damage caused by prolonged operation under the defective engine calibration.

67. While the Campaign may alter future engine operation, it does not evaluate or remediate the effects of years of excessive soot accumulation, elevated regeneration temperatures, and unnecessarily frequent thermal cycling. Many Class Trucks accumulated substantial mileage before Defendants implemented the Campaign, exposing the DPFs, SCRs, DOCs, and related aftertreatment components to prolonged and frequent periods of thermal stresses. The Campaign does not assess the extent of that damage nor restore affected aftertreatment components to their expected service lives.

68. Defendants also failed to provide an extended warranty, replacement coverage, or other protection against future premature aftertreatment system component failures attributable to the defective engine calibration. As a result, Defendants have placed on owners and operators the costly burden of substantial maintenance costs, repair expenses, downtime, and other

[30] *See Field Service Campaign D25M3*, p. 1.

operational disruptions associated with degraded or failing DPFs, SCRs, DOCs, and related aftertreatment components.

### G. Defendants' Misrepresentations Regarding Engine Efficiency, Aftertreatment System Reliability and Durability, and Fuel Economy

69. Defendants marketed the DD15 engine and its aftertreatment system as technologically superior to competing products, emphasizing fuel economy,[31] reduced ownership costs,[32] durability and reliability of the aftertreatment system, reduced regeneration frequency, and superior engineering design.[33] Detroit Diesel represents that the DD15s deliver "the best of the best in diesel engine technology and engineering," featuring an "innovative aftertreatment system," and providing increased "efficiency, durability and performance."[34] Defendants further represented that the aftertreatment system "shorten[s] regen cycles."[35] DTNA promotes that the

---

[31] *See, e.g.*, Detroit Diesel Corporation, *DD 15 Gen 5 Engine: New Level On-Highway Efficiency*, *available at* https://www.youtube.com/watch?v=FosMTsNoJI, last visited June 5, 2026 (video claiming engine controls allow faster achievement of peak power and improved fuel efficiency).

[32] Daimler Truck North America, Instagram (May 26, 2020), *available at* https://www.instagram.com/p/CAp9mxqJ9yT, last viewed June 5, 2026 (The DD15 is "[b]uilt on proven technology and fine-tuned for enhanced performance and durability, the next generation of efficiency has arrived."); Daimler Truck North America, Facebook (May 26, 2020), *available at* https://www.facebook.com/DaimlerTruckNorthAmerica/posts/introducing-the-latest-innovations-from-demand-detroit-the-dd15-gen-5-engine-and/3303526502992887 (same).

[33] Daimler Truck North America, *With new power ratings, improved fuel economy and the rock-solid reliability you expect from Detroit®, the DD15® Gen 5 is equipped for any job, available at* https://dtnacontent-dtna.prd.freightliner.com/content/dam/enterprise/documents/DDCPWR%2015904%20-%20DD15%20Gen%205%20Engine%20Vocational%20Spec%20Sheet_3.0.pdf ("A new and innovative feature shortens regen cycles by preventing aftertreatment system cooldown during coasting.").

[34] Detroit Diesel Corporation, *Detroit DD15 Engine*, *available at* www.demanddetroit.com/engines/dd15, last visited on June 5, 2026.

[35] *Id.*; Detroit Diesel Corporation, Facebook (April 5, 2021), facebook.com, *available at* https://www.facebook.com/demanddetroit/videos/its-whats-on-the-inside-that-counts-the-dd15-gen-5-has-been-re-engineered-and-re/830659134195967, last viewed June 5, 2026 (claiming that new engine and aftertreatment system features shorten regen cycles, leading to more uptime for operators); Detroit Diesel Corporation, Facebook (October 2, 2020), facebook.com, *available at*

DD15's "Ultra-high compression ratios . . . create better combustion" and achieve "up to 3% better fuel economy than previous generations"—a big selling point for businesses operating long-haul trucks.[36] Acknowledging the importance of engine power and responsiveness to their customer base, Detroit Diesel Corporation claims that the DD15 reaches "peak power and torque . . . faster, which gets payloads moving without compromising efficiency."[37]

---

https://www.facebook.com/demanddetroit/videos/dd15-gen-5-in-the-western-star-49x/3418144861576204, last viewed June 5, 2026 (claiming that "fuel in the DD15 gen five burns more completely," leading to improved aftertreatment system reliability).

[36] Daimler Truck North America, *Western Star Introduces All-New 57X, available at* https://northamerica.daimlertruck.com/news-stories/2022/western-star-introduces-all-new-57x *last viewed June 5, 2026* (making a variety of claims regarding improved "fuel economy" and that the DD15-equipped 57X truck "provides safety, efficiency, durability, and prestige . . . .")

[37] *See Detroit DD15 Engine.*

70. The following brochure is an example of the representations to the public Defendants made regarding the Class Trucks:[38]



71. Defendant Detroit Diesel provides particularly unambiguous misrepresentations in one of its videos regarding superior combustion performance and resulting lower DPF soot loading. Detroit Diesel claims that "Fuel in the DD15 Gen 5 burns more completely, achieving maximum power from every piston stroke ***with the added benefit of less fuel wasted and less soot through the DPF***."[39] The video goes on to claim, incorrectly, that new features "increase engine performance and aftertreatment reliability" and "result[] in less regens, longer replacement intervals, and reduced replacement costs."[40] This is the exact opposite of the facts revealed in materials explaining Field Service Campaign D25M3.

72. Defendant Western Star highlights similar characteristics of the DD15 engine. Western Star claims, for example, that the DD15 is "designed with the best in cutting-edge diesel engine technology for optimized power, durability, productivity, and efficiency."[41] It also claims its Model 49X is the "industry leading heavy-duty truck for durability, safety, and getting the job done."[42] On social media, Western Star claims the "#AllNew47 has got the power. The Demand Detroit #DD15 Gen 5 engine was designed with vocational-specific features including new

---

[38] Daimler Truck North America, *Detroit DD15 Gen 5 Vocational Technical Specs*, *available at* https://dtnacontent-dtna.prd.freightliner.com/content/dam/enterprise/documents/DDCPWR%2015904%20-%20DD15%20Gen%205%20Engine%20Vocational%20Spec%20Sheet_3.0.pdf, last viewed June 15, 2026.

[39] Detroit Diesel Corporation, *The DD15 Gen 5 Engine: Vocational Features*, *available at* https://www.youtube.com/watch?v=pmrCWrdxsNA, last viewed on June 5, 2026, at 0:00:18 to 0:00:30 (emphasis added).

[40] *Id.* at 0:00:53 to 0:01:02.

[41] Western Star Trucks, *Model 47X: Western star offers components that deliver the power and reliability you can count on*, *available at* https://www.westernstartrucks.com/powertrain, last viewed June 10, 2026.

[42] Western Star Trucks, *Model 49X:Turning mountains into molehills*, *available at* https://www.westernstartrucks.com/powertrain, last viewed June 10, 2026.

power ratings and improved aftertreatment system to decrease regens."[43] Finally, it represents that the "Demand Detroit #DD15 Gen 5 . . . bring[s] efficiency and performance to the next level. It offers the best in cutting-edge diesel engine technology and engineering, resulting in the most reliable engine for your Western Star."[44] In general, the striking similarities between the marketing materials published by DTNA, Detroit Diesel, and Western Star suggest a high degree of coordination regarding the scope and contours of Defendants' representations about the Class Trucks and the DD15 engines.

73. Defendants specifically emphasize the reliability and performance of the DD15's aftertreatment system in marketing directed to commercial trucking operators, whose purchasing decisions are heavily influenced by fuel economy, uptime, reliability, durability, total cost of ownership, and vehicle safety.[45] For example, Defendant DTNA's Freightliner Trucks Division represents that Defendants DTNA and Detroit Diesel had "continued to develop cutting-edge innovation on diesel particulate filters and aftertreatment systems, with the goal of decreasing potential [aftertreatment system] problems and increasing uptime,"[46] and further claimed that a "new aftertreatment system is able to do more with less space, increasing [aftertreatment system]

---

[43] Western Star Trucks, Facebook (March 3, 2021), facebook.com, *available at* https://www.facebook.com/westernstartrucks/photos/the-allnew49x-has-got-the-power-the-demand-detroit-dd15-gen-5-engine-was-designe/10158850350963293/?locale=bs_BA, last viewed June 8, 2026.

[44] Western Star Trucks, Facebook (October 11, 2020), facebook.com, *available at* https://www.facebook.com/westernstartrucks/videos/dd15-gen-5-western-star-trucks/796786477587357, last viewed June 9, 2026.

[45] Freightliner, *The Detroit DD15: The Next Generation of Efficiency*, *available at* https://www.freightliner.com/demand-detroit/engines/dd15, last viewed June 5, 2026 ("The DD15 ® engine touts impressive power ratings, an innovative aftertreatment system and other key features to increase efficiency, durability and performance. Designed with enhanced down speeding for better fuel economy and a swirl piston design for maximum combustion.").

[46] *Id.*

maintenance intervals."[47] Defendants also claimed the DD15s delivered "power, uptime, and optimum fuel economy."[48] Heavy-duty trucks equipped with DD15 engines are designed and marketed for high-mileage commercial use, where even modest increases in fuel consumption, downtime, maintenance frequency, or repair costs materially affect operating profitability.

74. The consequences of the defective engine calibration undermine Defendants' marketing representations. Rather than reducing regeneration frequency and duration, increasing aftertreatment system reliability and durability, and lowering operating costs, the defect causes excessive soot accumulation, more frequent regeneration events, accelerated degradation of the DPFs and SCRs, increased DPF maintenance, and reduced vehicle reliability. Plaintiffs and Class members incurred more frequent DPF cleanings and replacements, downtime, and other operational disruptions in direct conflict with Defendants' representations regarding durability, efficiency, uptime, and reduced ownership costs.

75. Defendants' representations regarding the DD15's engineering, fuel efficiency, reliability, durability, and aftertreatment-system performance were material to Plaintiffs' and Class Members' purchasing decisions. For commercial trucking operators, fuel economy is among the most significant factors in vehicle selection because it is the key driver of total cost of ownership. Even if the Campaign's reduction in fuel economy proves modest, any decreases in fuel efficiency translate into substantial increases in operating costs over hundreds of thousands of miles these working trucks are driven in their lifetimes. Plaintiffs and Class members paid premium prices for vehicles equipped with DD15 engines and aftertreatment systems but did not receive the performance, durability, reliability, and reduced operating costs Defendants

---

[47] *Id.*

[48] Detroit Diesel Corporation, *Integrated Detroit Powertrain*, *available at* www.demanddetroit.com/idp, last visited May 12, 2026.

promised. The defect therefore deprived Plaintiffs and Class members of the benefit of their bargain.

### H. DTNA Markets the Class Trucks and Facilitates Their Maintenance Services Through a Variety of Agents Who Interacted with Plaintiffs and Other Class Members

76. Plaintiff Fire Chief Transport LLC purchased its Class Truck from Premier Truck Group of Dallas, an authorized dealer of Defendant DTNA's Freightliner and Western Star trucks.

77. Plaintiff Charles Floyd purchased his Class Truck from Premier Truck Group of Oklahoma City, also an authorized dealer of Defendant DTNA's Freightliner and Western Star trucks.

78. Plaintiff Happycat Transport LLC purchased its Class Truck from TAG Truck Center, also an authorized dealer of Defendant DTNA's Freightliner and Western Star trucks.

79. Defendant DTNA's authorized dealerships, including Premier Truck Group of Dallas, Premier Truck Group of Oklahoma City, and TAG Truck Center, act as agents of Defendant DTNA.

80. Premier Truck Group and SelecTrucks operate a joint network of commercial truck dealerships across the country that are "backed" by Defendant DTNA.[49] Premier Truck Group and SelecTrucks share a website and operate out of the same facilities. SelecTrucks is owned by Defendant DTNA.[50]

---

[49] *Welcome to SelecTrucks*, Premier Truck Group, https://premiertruck.com/selectrucks.

[50] Premier Truck Group of Dallas North, https://premiertruck.com/locations/premier-truck-group-of-dallas-north (SelecTrucks is "proud to be a part of Daimler Trucks North America."), https://northamerica.daimlertruck.com/news-stories/2025/selectrucks-expands-access-to-premium-used-trucks-with-new-nashville-location ("SelecTrucks is a brand of Daimler Truck North America LLC.")

81. Premier Truck Group and TAG Truck Center repair and service Daimler trucks, including Class Trucks, in accordance with Defendant DTNA's instructions, manuals, and technical guidance.

82. Premier Truck Group also performs recalls and Field Service Campaigns in accordance with Defendant DTNA's requirements.[51] All Premier Truck Group service locations are designated Western Star and/or Freightliner warranty service locations.[52]

83. Similarly, TAG Truck Center services Daimler trucks using Defendant DTNA's and Defendant Detroit Diesel's parts and performs warranty repairs on Defendants' trucks.[53]

84. Premier Truck Group acted as Defendant DTNA's agent when it disseminated warranties, representations, and assurances concerning the Class Trucks to Plaintiffs and Class members, including those provided to Plaintiffs and Class members in connection with their purchases of Class Trucks from Premier Truck Group.

85. TAG Truck Center likewise acted as Defendant DTNA's agent when it disseminated warranties, representations, and assurances concerning the Class Trucks to Plaintiffs and Class members, including those provided to Plaintiffs and Class members in connection with their purchases of Class Trucks from TAG Truck Center.

## I. The Software Reflash Will Increase Fuel Consumption and Reduce Engine Performance

86. The Campaign attempts to reduce soot accumulation and regeneration frequency by revising the DD15's engine calibration. The fundamental premise of the reflash is that modifying the engine calibration will reduce engine-out soot production. However, changes to

[51] https://premiertruck.com/warranty
[52] https://premiertruck.com/service-department
[53] https://www.tntxtruck.com/Parts/Monthly-Specials

engine calibrations necessarily involve engineering tradeoffs that will adversely affect fuel economy and other performance characteristics valued by owners and operators of the Class Trucks.

87. In diesel-engine design and calibration, soot production, fuel economy, NOx emissions, power output, and engine responsiveness are closely interrelated. Reducing soot production typically requires changes to fuel-injection timing, injection pressure, air-fuel ratios, or other combustion parameters. Although such changes may reduce DPF soot loading and regeneration frequency, they can also produce unintended consequences, including:

- Increased fuel consumption via the use of extended or post-injection fueling events now being used to burn soot in-cylinder;
- Increased DEF consumption to address increases in engine-out NOx caused by revised fueling strategies and/or reductions in the use of exhaust gas recirculation ("EGR").[54] The EGR system ports a calibratable percentage of exhaust gases back into the cylinders, cooling combustion temperature. Decreasing the use of EGR results in less soot, but allows the amount of NOx leaving the cylinders to increase. As the amount of engine-out NOx increases, more DEF must generally be used to prevent excessive NOx from exiting the tailpipe;
- Reduced torque or horsepower under certain operating conditions; and
- Changes in drivability characteristics, including throttle response, turbo lag, or power delivery.

[54] While Defendants have disclosed that Field Service Campaign D25M3 modified certain fueling maps, on information and belief it is possible that changes were also made to EGR maps.

88. The Campaign bulletin identifies the remedy solely as updating the MCM's fuel maps[55] but it does not disclose whether the revised calibration affects fuel economy, horsepower, torque, drivability, or other performance characteristics. On information and belief, the Campaign's revised fuel maps reduce fuel efficiency by injecting some fuel after the main combustion stroke is complete in order to burn up some of the soot before the exhaust enters the DPF. For commercial trucking operators, even modest reductions in fuel economy or performance can have significant economic consequences. For example, a typical long-haul truck driver covering 100,000 miles per year with a DD15-powered rig would see operating costs increase approximately $1,400 per year for a two percent drop in fuel efficiency.[56]

## V. CLASS ACTION ALLEGATIONS

89. Plaintiffs bring this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4) on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes (collectively, the "Classes"). The Class Trucks implicated by this Complaint include all of those equipped with a model year 2021 through 2025 Gen5 DD15 engine (model 472.912) produced between January 15, 2020, and February 21, 2025 (the "Class Trucks").

90. The proposed Classes are defined as:

**Nationwide Class**: All persons and entities who purchased or leased a Class Truck in the United States, including its territories.

**California State Class**: All persons and entities who purchased or leased a Class Truck in or from California.

---

[55] *Field Service Campaign D25M3*, p. 5.

[56] Assumes current average national price of $5.20/gallon for diesel fuel with a base fuel efficiency of 7.5 MPG.

**Kentucky State Class**: All persons and entities who purchased or leased a Class Truck in or from Kentucky.

**Oklahoma State Class**: All persons and entities who purchased or leased a Class Truck in or from Oklahoma.

**Pennsylvania State Class**: All persons and entities who purchased or leased a Class Truck in or from Pennsylvania.

**Texas State Class**: All persons and entities who purchased or leased a Class Truck in or from Texas.

91. Excluded from the Classes are:

a. Defendants' officers, directors, and employees; Defendants' affiliates and affiliates' officers, directors, and employees; Defendants' distributors and distributors' officers, directors, and employees; and

b. Judicial officers and their immediate family members and associated court staff assigned to this case.

92. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, reduced, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

93. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims. This action may also, in the Court's discretion, be maintained as a class action with respect to particular common issues.

94. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23 and satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

**A. Numerosity: Federal Rule of Civil Procedure 23(a)(1)**

95. The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe that there are approximately 200,000 Class Trucks and tens of thousands or more members of the Nationwide Class, and at least hundreds or thousands of members in each State Class. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**B. Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

96. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether the original DD15 engine calibration was defective and caused the Class Trucks to generate excessive soot;

b. Whether excessive soot accumulation caused unnecessarily frequent active and parked regeneration events;

c. Whether the defective engine calibration accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components;

d. Whether the defective engine calibration created a dangerous safety risk;

e. Whether Defendants knew or should have known of the defective engine calibration and resulting aftertreatment-system damage and, if so, when;

f. Whether Defendants adequately disclosed the defect and its consequences to purchasers of the Class Trucks;

g. Whether Defendants' Field Service Campaign D25M3 adequately remedies the defect and resulting aftertreatment-system damage;

h. Whether Defendants' representations regarding fuel economy, regeneration frequency, aftertreatment-system reliability, durability, uptime, DEF consumption, operating costs, and safety were false or misleading;

i. Whether Defendants violated the consumer protection, warranty, and other laws asserted herein;

j. Whether Plaintiffs and Class members suffered an ascertainable loss or damages as a result of the defect;

k. Whether Plaintiffs and Class members are entitled to damages, restitution, equitable relief, injunctive relief, or other relief; and

l. The proper measure of damages and other relief.

**C. <u>Typicality: Federal Rule of Civil Procedure 23(a)(3)</u>**

97. Plaintiffs' claims are typical of the claims of the members of the proposed classes whom they seek to represent under Fed. R. Civ. P. 23(a)(3) because Plaintiffs and each Class member purchased or leased a Class Truck and were comparably injured through Defendants' wrongful conduct as described above. Plaintiffs and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiffs' claims are based upon the same legal theories as the claims of the other Class members.

**D. Adequacy: Federal Rule of Civil Procedure 23(a)(4)**

98. Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests do not conflict with the interests of the Class members. Plaintiffs have retained counsel experienced in complex class action litigation, including vehicle emissions litigation and other complex consumer protection litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

**E. Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

99. Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and other members of each Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to each Class as a whole.

**F. Superiority: Federal Rule of Civil Procedure 23(b)(3)**

100. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. While Class members have suffered significant economic harm, the cost and burden of individually litigating these claims against Defendants would be substantial and would make individual actions impractical for many Class members.

101. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI. ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A. Discovery Rule Tolling

102. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

103. Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered that Defendants were concealing the defective engine calibration in the Class Trucks and the resulting aftertreatment system damage. The defect involved sophisticated engine control software that was not accessible to or understandable by ordinary consumers.

104. Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Defendants intentionally failed to report information within their knowledge to federal and state authorities, dealerships, or consumers until—at the earliest—July 22, 2025, when Defendants first publicly disclosed the existence of the defect through Field Service Campaign D25M3. Plaintiffs did not discover Defendants' wrongful conduct until after that date, in connection with retaining counsel.

105. Likewise, a reasonable and diligent investigation could not have disclosed that Defendants had information in their possession about the existence of the defective engine calibration and its effect on the Class Trucks' aftertreatment components, and that they concealed that information, which Plaintiffs only discovered shortly before this action was filed.

### B. Tolling Due to Fraudulent Concealment

106. Throughout the relevant time period, all applicable statutes of limitation have been tolled by Defendants' knowing and active fraudulent concealment of the facts alleged in this Complaint.

107. Upon information and belief, before publicly disclosing the defect through Field Service Campaign D25M3, Defendants knew of the defective engine calibration in the Class Trucks, and the resulting excessive soot accumulation, excessive regeneration frequency, and aftertreatment system damage, but continued to allow Plaintiffs and Class members to purchase and operate the Class Trucks with the defective calibration. In so doing, Defendants concealed and/or failed to disclose the true nature of the defect and its consequences to Plaintiffs and Class members.

108. Instead of disclosing the defect, Defendants continued to manufacture, market, and sell Class Trucks without disclosing that the defective engine calibration caused excessive engine soot production leading to failures and accelerated aging of the Class Trucks' aftertreatment components.

109. Any otherwise-applicable statutes of limitation have therefore been tolled by Defendants' exclusive knowledge and active concealment of the facts alleged herein.

**C. Estoppel**

110. Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Trucks, including the performance and reliability and durability of their aftertreatment systems, and their compliance with applicable federal and state law.

111. Although Defendants had the duty throughout the relevant period to disclose to Plaintiffs and Class members that the Class Trucks contained a defective engine calibration causing excessive soot production, excessive regeneration frequency, and damage to the aftertreatment system, Defendants did not disclose this information and did not correct their other disclosures with respect to the Class Trucks. Defendants actively concealed the true

character, quality, and nature of the defect in the Class Trucks, and made misrepresentations about the quality, reliability, characteristics, and/or performance of the Class Trucks.

112. Defendants actively concealed the true character, quality, performance, and nature of the defect in the Class Trucks, and Plaintiffs and the Class members reasonably relied upon Defendants' knowing and active concealment of these facts.

113. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII. CLAIMS

### A. Claims Asserted on Behalf of the Nationwide Class

#### 1. NATIONWIDE COUNT I: Fraud by Concealment (Common Law)

114. Plaintiffs Fire Chief Transport LLC, Happycat Transport LLC, Charles Floyd, and Christopher Price (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all paragraphs as though fully set forth herein.

115. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class under Oregon law or, in the alternative, under the laws of all fifty states and Puerto Rico, as applicable under Oregon's choice-of-law rules, against all Defendants. In the alternative, Plaintiffs bring claims on behalf of the State Classes under the respective State laws against all Defendants. If the Court determines that different states' laws govern different Class members' claims, Plaintiffs alternatively seek certification of the State Classes, appropriate subclasses, or groups of claims governed by materially similar laws.

116. Defendants are liable for fraudulent concealment, nondisclosure, and misleading half-truths. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977). Plaintiffs' half-truth

theory rests on the specific representations they encountered and relied on before purchasing or leasing their Class Trucks, as alleged above.

117. Specifically, Defendants committed fraud by:

a. knowingly and intentionally failing to disclose to Plaintiffs and Nationwide Class members material information about the Class Trucks' true engine performance, fuel efficiency, regeneration frequency, reliability, durability, operating costs, and safety, while obtaining money from Nationwide Class members;

b. misrepresenting the Class Trucks as free from defects affecting engine performance, fuel efficiency, regeneration frequency, aftertreatment-system reliability and durability, and engine-related safety risks;

c. knowingly designing and manufacturing the Class Trucks in an unsafe manner that caused them to achieve worse performance, reliability, and durability than what was represented to individuals and entities who purchased them, and failing to adequately remedy the defect and resulting aftertreatment-system damage; and

d. knowingly and intentionally omitting that Field Service Campaign D25M3 may adversely affect fuel efficiency and other performance characteristics.

118. Defendants actively concealed from Plaintiffs the engine calibration defect and the detrimental effects it has on soot accumulation, regeneration frequency, fuel efficiency, and the reliability, durability, and safety of the aftertreatment system in that they (a) created false impressions that covered up the truth about the Class Trucks, and (b) took actions that removed an opportunity for Plaintiffs to discover the defect, because they:

a. Knowing the defect was contained in non-accessible software and fuel mapping, and that the DPF is sealed in metal housing that owners cannot readily inspect themselves, Defendants devised a software reflash campaign that affirmatively does not require any inspection of the components of the Class Trucks, thus preventing discovery of the defect and the foreseeable physical degradation and damage it causes;

b. Disseminated marketing that created false impressions of the Class Trucks and their performance—such as "3% better fuel economy," "shortens regen cycles" and "less regens, longer replacement intervals, and reduced replacement costs," *see supra* § IV.G—and thus covered up the truth about the Class Trucks; and

c. Described the software reflash to customers as designed to "ensure vehicle functionality and optimal performance are not compromised,"[57] thus creating a false impression about and denying the negative impacts on performance and operating metrics that were material to Class Truck purchasers.

119. Defendants also had a duty to disclose the engine calibration defect and the detrimental effects it has on soot accumulation, regeneration frequency, fuel efficiency, and the reliability, durability, and safety of the aftertreatment system because they:

a. possessed exclusive knowledge due to their involvement in the design and testing of the engine control software and validation and durability testing

---

[57] Daimler Truck North America LLC, July 22, 2025 Field Service Campaign "Copy of Notice to Owners", as revised December 15, 2025.

of the aftertreatment system in Class Trucks. Defendants also knew that these technical facts were not known to or reasonably discoverable by Plaintiffs and the Classes;

b. possessed exclusive knowledge that Field Service Campaign D25M3 would be necessary and may adversely affect fuel economy and other performance characteristics and fails to address the cumulative degradation and premature aging already suffered by the DPFs, SCRs, and related aftertreatment components before implementation of the Campaign reflash;

c. knew that the DPFs could become so clogged with soot that they posed safety risks such as engine and aftertreatment system fires;

d. intentionally concealed the foregoing from Plaintiffs and Nationwide Class members, which constitutes fraud with or without a duty to disclose; and

e. made affirmative statements and incomplete representations about the Class Trucks with respect to engine performance, fuel efficiency, reduced regeneration cycles, and aftertreatment system reliability and durability while purposefully withholding material facts about the engine calibration defect. In uniform advertising and marketing materials provided with the Class Trucks, Defendants intentionally concealed, suppressed, and failed to disclose to Plaintiffs and the Classes the engine calibration defect and its effects on soot accumulation, regeneration frequency, fuel efficiency, and aftertreatment system reliability and durability.

120. Defendants knew that these facts about the Class Trucks would be important to customers deciding to purchase them. Defendants ensured that Plaintiffs and the Classes did not discover this information through actively concealing it. Defendants intended for Plaintiffs and the Classes to rely on their misrepresentations and omissions—which they did by paying for the Class Trucks.

121. Plaintiffs' and Nationwide Class members' reliance on Defendants' concealed facts, omissions, and false or misleading representations was reasonable because a reasonable customer would not have expected that their Class Trucks contain dangerously defective engine calibrations that do not provide the represented and reasonably expected engine performance, safety, fuel efficiency, and aftertreatment system reliability and durability. A reasonable consumer would have considered these facts important in deciding whether to purchase the Class Trucks or to pay a lesser price.

122. In breach of their duty to disclose material facts about the engine calibration defect, Defendants' deceptive actions harmed Plaintiffs and the Classes. Because Defendants fraudulently concealed the truth about the Class Trucks, Plaintiffs and other customers who paid for the Class Trucks suffered economic losses. Plaintiffs suffered damages including but not limited to overpaying for vehicles that did not perform as represented and reasonably expected, increased fuel consumption, frequent and costly DPF cleanings and replacements, accelerated degradation of DPFs, SCRs, DOCs, and related aftertreatment components, increased downtime, reduced vehicle reliability, and out-of-pocket repair expenses. Accordingly, Defendants are liable to Plaintiffs and the Classes for damages in an amount to be proven at trial.

123. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Classes; and to

enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### 2. NATIONWIDE COUNT II: Unjust Enrichment (Common law)

124. Plaintiffs Fire Chief Transport LLC, Happycat Transport LLC, Charles Floyd, and Christopher Price (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference paragraphs 1-81 as though fully set forth herein.

125. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class under Oregon law or, in the alternative, under the laws of all fifty states and Puerto Rico, as applicable under Oregon's choice-of-law rules, against all Defendants. In the alternative, Plaintiffs bring claims on behalf of the State Classes under the respective State laws against all Defendants. If the Court determines that different states' laws govern different Class members' claims, Plaintiffs alternatively seek certification of the State Classes, appropriate subclasses, or groups of claims governed by materially similar laws.

126. At all times alleged herein, Defendant DTNA's authorized dealerships, including Premier Truck Group and TAG Truck Center, acted as agents of Defendant DTNA when selling or leasing the Class Trucks to Plaintiffs and Class members.

127. By reason of their conduct, Defendants damaged Plaintiffs and the Classes. Plaintiffs and the Classes conferred a benefit directly on Defendants by overpaying for Class Trucks at prices that were artificially inflated by Defendants' misrepresentations, concealment, and omissions regarding the true nature of the Class Trucks' engine performance, fuel efficiency,

regeneration frequency, and aftertreatment system durability and reliability, as well as the existence of the dangerous engine calibration defect.

128. As a result of Defendants' fraud and deception, Plaintiffs and members of the Classes were not aware of the true facts concerning the Class Trucks.

129. Plaintiffs and members of the Classes did not benefit from the Defendants' misconduct.

130. Defendants knowingly benefitted from their unjust conduct. They sold and leased the Class Trucks for more than what the vehicles were worth, and/or accepted the inflated benefits from the sale and lease of the Class Trucks, at the expense of Plaintiffs and the Classes.

131. Plaintiffs and the Classes conferred tangible and material economic benefits upon Defendants when they purchased or leased the Class Trucks. Defendants profit from sales and leases of Class Trucks, including through Defendants' authorized dealership network.

132. Defendants readily accepted and retained these benefits from Plaintiffs and the Classes. Plaintiffs and the Classes would not have purchased or leased the Class Trucks, or would have paid less for them, had they known the truth about these vehicles at the time of purchase or lease. Therefore, Defendants profited from the sale and lease of the Class Trucks to the detriment and expense of Plaintiffs and the Classes.

133. It is inequitable and unconscionable for Defendants to retain these benefits because they misrepresented and concealed material facts regarding the Class Trucks' engine performance, fuel efficiency, regeneration frequency, and aftertreatment system reliability and durability. Defendants further concealed the existence and consequences of the engine calibration defect. Plaintiffs and members of the proposed Classes would not have purchased the Class Trucks or would have paid less for them, had Defendants disclosed the truth.

134. Plaintiffs and the Classes do not have an adequate remedy at law.

135. Equity cannot in good conscience permit Defendants to retain the benefits that they derived from Plaintiffs and the Classes through unjust and unlawful acts, and therefore restitution or disgorgement of the amount of Defendants' unjust enrichment is necessary.

136. Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(d)(2)-(3). If Plaintiffs' claims for damages are dismissed or judgment is entered on them in favor of Defendants, the Plaintiffs will have no adequate legal remedy.

### 3. NATIONWIDE COUNT III: Breach of Implied Warranty of Merchantability (Uniform Commercial Code)

137. Plaintiffs Fire Chief Transport LLC, Happycat Transport LLC, Charles Floyd, and Christopher Price (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all paragraphs as though fully set forth herein.

138. Plaintiffs bring this Count on behalf of themselves and the Nationwide Class under Oregon law or, in the alternative, under the laws of all fifty states and Puerto Rico, as applicable under Oregon's choice-of-law rules, against all Defendants. All states (except Louisiana, which has its own analog) have adopted Uniform Commercial Code § 2-314, which provides that every contract for sale includes an implied warranty that the goods are merchantable. This common question of merchantability is the essence of an implied warranty claim and predominates over any potential differences among the states' individual implied warranty laws.

139. In the alternative, as detailed in the State-specific counts below, Plaintiffs bring Counts on behalf of the State Classes under the respective State laws, against all Defendants.

140. Defendants are liable for breach of the implied warranty of merchantability. *See, e.g.*, U.C.C. §§ 2-314, 2A-212.

141. Defendants are and were at all relevant times "merchant[s]" and "seller[s]" of vehicles under U.C.C. § 2-314.

142. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under U.C.C. § 2A-212.

143. The Class Trucks are and were at all relevant times "goods" within the meaning of U.C.C. § 2-314 and § 2A-212.

144. Warranties that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to U.C.C. §§ 2-314 and 2A-212.

145. Defendants' warranties were made for the benefit of Plaintiffs and Class members as the ultimate end user of the Class Trucks.

146. Defendants made representations to Plaintiffs and Class members regarding the limited warranties applicable to their Class Trucks. Plaintiffs and Class members relied on those representations when purchasing their Class Trucks.[58]

147. These Class Trucks, when sold and at all relevant times thereafter, were defective and not in merchantable condition, would not pass without objection in trade, and were not fit for

---

[58] *See, e.g.*, Daimler Truck North America, *DD Platform Gen 5 Warranty Booklet,* available at https://dtnacontent-dtna.prd.freightliner.com/content/dam/public/DDCSN/warrantybooklets/DDC-WAR-MAN-0217_2025b.pdf, last visited October 8, 2026; see also Freightliner, *Warranty*, available at https://www.freightliner.com/warranty-and-extended-coverage/warranty, last visited October 8, 2026. For example, Plaintiff Floyd spoke with a Premier Truck Group salesperson who provided information about warranties applicable to his Class Truck and convinced Plaintiff Floyd to purchase an extended warranty.

the ordinary purpose for which such vehicles are used. Specifically, Defendants installed the dangerously defective engine calibration that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components, reduced vehicle reliability, increased operating and maintenance costs, and created safety risks.

148. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiffs were excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiffs provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

149. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Nationwide Class members have been damaged in an amount to be proven at trial.

## B. Claims Asserted on Behalf of the State-Specific Classes

### 1. California

#### a. CALIFORNIA COUNT I: Violations of the California Unfair Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.*

**(On Behalf of the California State Class)**

150. Plaintiffs Fire Chief Transport LLC and Charles Floyd (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference paragraphs 1-113 and 165-173 as though fully set forth herein.

151. Plaintiffs bring this Count on behalf of themselves and the California State Class against all Defendants.

152. California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the Unfair Competition Law ("UCL").

153. Defendants' knowing and intentional conduct, as described herein, constitutes unlawful, fraudulent, and unfair business acts and practices in violation of the UCL. Defendants violated the UCL in at least the following ways:

a. by knowingly and intentionally failing to disclose to Plaintiffs and California State Class members material information about the Class Trucks' true engine performance, fuel efficiency, regeneration frequency, reliability, durability, operating costs, and safety, while obtaining money from California State Class members;

b. by misrepresenting the Class Trucks as free from defects affecting engine performance, fuel efficiency, regeneration frequency, aftertreatment-system reliability and durability, and engine-related safety risks;

c. by knowingly designing and manufacturing the Class Trucks in an unsafe manner that caused them to achieve worse performance, reliability, and durability than what was represented to individuals and entities who purchased them, and failing to adequately remedy the defect and resulting aftertreatment-system damage;

d. by knowingly and intentionally omitting that Field Service Campaign D25M3 may adversely affect fuel efficiency and other performance characteristics; and

e. by violating the other California laws alleged herein, including the False Advertising Law and California Commercial Code.

154. Defendants owed Plaintiffs and California State Class members a duty to disclose the truth about the defective engine calibration and its consequences in the Class Trucks because Defendants:

a. possessed exclusive knowledge due to their involvement in the design, installment, and extensive testing of engine control software, engine performance, and aftertreatment system reliability and durability in the Class Trucks;

b. possessed exclusive knowledge that Field Service Campaign D25M3 would be necessary and could adversely affect fuel economy, DEF consumption, and other performance characteristics while doing nothing to remedy or otherwise address damage to the Class Trucks' DPFs, SCRs, and DOCs;

c. intentionally concealed the foregoing from Plaintiffs and California State Class members; and

d. made, helped to make, or conspired to make incomplete representations regarding the Class Trucks' performance, reliability, and durability, and about the impact of Field Service Campaign D25M3 while purposefully

withholding material facts from Plaintiffs and the California State Class members that contradicted these representations.

155. Defendants' acts and practices were likely to deceive and did deceive Plaintiffs and the public. In failing to disclose the dangerous engine control system software defect and suppressing other material facts from Plaintiffs and California State Class members, Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and California State Class Members.

156. Defendants' misrepresentations and omissions alleged herein caused Plaintiffs and the California State Class members to make their purchases of their Class Trucks. Defendants' concealed facts, omissions, and false or misleading representations to Plaintiffs and the California State Class members, as alleged herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Class Trucks or to pay a lesser price.

157. Absent those misrepresentations and omissions, Plaintiffs and California State Class members would not have purchased these Class Trucks, would not have purchased these Class Trucks at the prices they paid, and/or would have purchased less expensive alternative vehicles that did not have the defective engine calibration or issues with degraded aftertreatment system reliability and durability.

158. Accordingly, Plaintiffs and California State Class members have suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

159. Defendants' violations present a continuing risk to Plaintiffs and California State Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

160. The injuries suffered by Plaintiffs and Class members are not outweighed by any potential countervailing benefit to consumers or to competition, nor are the injuries that Plaintiffs and California State Class members suffered injuries that could have been reasonably avoided.

161. Plaintiffs plead this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(d)(2)-(3). If Plaintiffs' claims for damages are dismissed or judgment is entered on it in favor of Defendants, Plaintiffs will have no adequate legal remedy. Additionally, Plaintiffs have no adequate remedy at law, including for the future unlawful acts, methods, or practices as set forth above absent an injunction, and Plaintiffs and the California State Class members lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action.

162. Moreover, Defendants' alleged misconduct is ongoing and therefore damages are not certain or prompt and thus are an inadequate remedy to address the conduct that injunctions are designed to prevent.

163. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to members of the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

164. Plaintiffs, on behalf of themselves and the California State Class, further seek an award of attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

### b. CALIFORNIA COUNT II: Violations of the California False Advertising Law Cal. Bus. & Prof. Code § 17500 *et seq.*

**(On Behalf of the California State Class)**

165. Plaintiffs Fire Chief Transport LLC and Charles Floyd (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference paragraphs 1-113 as though fully set forth herein.

166. Plaintiffs bring this Count on behalf of themselves and the California State Class against all Defendants.

167. California Bus. & Prof. Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

168. Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including California State Class members.

169. Defendants have violated Section 17500 because the misrepresentations and omissions regarding the engine performance, fuel efficiency, regeneration frequency, and

aftertreatment system reliability, durability, operating costs as set forth in this Complaint were material and likely to deceive a reasonable consumer.

170. Plaintiffs and the other California State Class members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Trucks, the California State Class relied on the misrepresentations and/or omissions of Defendants. Defendants' representations turned out not to be true because the Class Trucks were equipped with a dangerously defective engine calibration that causes excessive soot generation, excessive regeneration frequency, and accelerated degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

171. All of the wrongful conduct alleged herein occurred in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated, both in the State of California and nationwide.

172. Plaintiffs and the California State Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to the California State Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

173. Plaintiffs plead this claim separately as well as in the alternative to its claims for damages under Fed. R. Civ. P. 8(d)(2)-(3). If Plaintiffs' claims for damages are dismissed or judgment is entered on it in favor of Defendants, Plaintiffs will have no adequate legal remedy. Additionally, Plaintiffs have no adequate remedy at law, including for the future unlawful acts, methods, or practices as set forth above absent an injunction, and Plaintiffs and the California

State Class members lack an adequate remedy at law to recover or fully recover amounts and benefits subject to restitution pursuant to this cause of action.

### c. **CALIFORNIA COUNT III: Breach of Express Warranty Cal. Com. Code §§ 2313 and 10210**

**(On Behalf of the California State Class)**

174. Plaintiffs Fire Chief Transport LLC and Charles Floyd (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

175. Plaintiffs bring this Count on behalf of themselves and the California State Class against all Defendants.

176. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of vehicles under § 2103(1)(d).

177. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Cal. Com. Code § 10103(a)(16).

178. The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

179. In connection with the purchase or lease of the Class Trucks, DTNA and Western Star provide a limited warranty which covers defects in material and/or workmanship within the warranty period. Detroit Diesel provides an engine warranty for 2 years (unlimited miles).

180. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

181. Defendants' warranties were made for the benefit of Plaintiffs and Class members as the ultimate end user of the Class Trucks.

182. Defendants made representations to Plaintiffs and Class members regarding the limited warranties applicable to their Class Trucks. Plaintiffs and Class members relied on those representations when purchasing their Class Trucks.[59]

183. Despite the existence of warranties, Defendants failed to inform Plaintiffs and California State Class members that the Class Trucks were defectively designed because they were equipped with the dangerous engine calibration defect that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs and related aftertreatment components, reduced vehicle performance, reliability, and durability, and increased operating and maintenance costs, and Defendants failed to adequately remedy the defect and resulting aftertreatment system damage free of charge.

184. Defendants breached the express warranty promising to repair and correct defects in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects and are unable to do so without negatively affecting the performance of the Class Trucks.

185. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

186. Furthermore, the limited warranty promising to repair and correct Defendants' defects in materials and workmanship fails in its essential purpose because the contractual

[59] *See supra* note 58.

remedy is insufficient to make California State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

187. Accordingly, recovery by Plaintiffs and California State Class members is not restricted to the limited warranty promising to repair and correct defects in materials and workmanship, and they seek all remedies as allowed by law.

188. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiffs and California State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

189. Moreover, many of the injuries flowing from the defective engine calibration cannot be resolved through the limited remedy of repairing and correcting Defendants' defects in materials and workmanship, as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein and because of their failure and/or continued failure to provide such limited remedy within a reasonable time. Any limitation on Plaintiffs' and California State Class members' remedies would be insufficient to make them whole.

190. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and California State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

191. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiffs were excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiffs provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

192. As a direct and proximate result of Defendants' breach of express warranties, California State Class members have been damaged in an amount to be determined at trial.

### d. CALIFORNIA COUNT IV: Breach of Implied Warranty of Merchantability Cal. Com. Code §§ 2314 and 10212

**(On Behalf of the California State Class)**

193. Plaintiffs Fire Chief Transport LLC and Charles Floyd (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

194. Plaintiffs bring this Count on behalf of themselves and the California State Class against all Defendants.

195. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of vehicles under § 2103(1)(d).

196. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Cal. Com. Code § 10103(a)(16).

197. The Class Trucks are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

198. Warranties that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

199. Defendants' warranties were made for the benefit of Plaintiffs and Class members as the ultimate end user of the Class Trucks.

200. Defendants and their agents made direct representations to Plaintiffs and Class members regarding the limited warranties applicable to their Class Trucks. Plaintiffs and Class members relied on those representations when purchasing their Class Trucks.[60]

201. These Class Trucks, when sold or leased and at all times thereafter, were defective, dangerous, and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, Defendants installed defective engine calibration that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components, reduced vehicle reliability, increased operating and maintenance costs, and created a safety risk.

202. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiffs were excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the

[60] *See supra* note 58.

aftertreatment system before Plaintiffs provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

203. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and California State Class members have been damaged in an amount to be proven at trial.

### e. CALIFORNIA COUNT V: Failure to Recall/Retrofit

**(On Behalf of the California State Class)**

204. Plaintiffs Fire Chief Transport LLC and Charles Floyd (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

205. Plaintiffs bring this Count on behalf of themselves and the California State Class against all Defendants.

206. Defendants manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Class Trucks, as set forth above.

207. Defendants knew or reasonably should have known that, due to the defective engine calibration, the Class Trucks require more frequent high-temperature regeneration events and reasonably should have known that the Class Trucks were likely to be dangerous when used in a reasonably foreseeable manner.

208. Defendants failed to recall the Class Trucks in a timely manner or warn of the Class Trucks' increased high-temperature regeneration events caused by the defective engine calibration.

209. A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Class Trucks.

210. Plaintiffs and California State Class members were harmed by Defendants' failure to recall the Class Trucks properly and in a timely manner and, as a result, have suffered damages, caused by Defendants' ongoing failure to properly recall, retrofit, and fully repair the Class Trucks. Defendants' failure to timely recall the Class Trucks was a substantial factor in causing harm to Plaintiffs and California State Class members as alleged herein.

### 2. Kentucky

#### a. KENTUCKY COUNT I: Breach of Express Warranty Ky. Rev. Stat. §§ 355.2-313 and 355.2A-210

**(On Behalf of the Kentucky State Class)**

211. Plaintiff Happycat Transport LLC (hereinafter referred to in this Count as "Plaintiff") re-alleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

212. Plaintiff brings this Count on behalf of itself and the Kentucky State Class against all Defendants.

213. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of vehicles under § 355.2-103(1)(d).

214. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

215. The Class Trucks are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

216. In connection with the purchase or lease of the Class Trucks, DTNA and Western Star provide a limited warranty which covers defects in material and/or workmanship within the warranty period. Detroit Diesel provides an engine warranty for 2 years (unlimited miles).

217. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

218. At all times alleged herein, Defendant DTNA's authorized dealerships, including TAG Truck Center, acted as DTNA's agents when selling or leasing the Class Trucks to Plaintiff and Class members.

219. Defendants' warranties were made for the benefit of Plaintiff and Class members as the ultimate end user of the Class Trucks.

220. Defendants and their agents made direct representations to Plaintiff and Class members regarding the limited warranties applicable to their Class Trucks.[61]

221. Despite the existence of warranties, Defendants and their agents failed to inform Kentucky State Class members that the Class Trucks were defectively designed because they were equipped with the dangerous engine calibration defect that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components, reduced vehicle performance, reliability, and durability, and increased operating and maintenance costs, and Defendants failed to adequately remedy the defect and resulting aftertreatment system damage free of charge.

222. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and

[61] *See supra* note 58.

have been unable to repair or adjust, the Class Trucks' materials and workmanship defects, and are unable to do so without negatively affecting the performance of the Class Trucks.

223. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

224. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Kentucky State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

225. Accordingly, recovery by Kentucky State Class members is not restricted to the limited warranty promising to repair and correct the defect in materials and workmanship, and they seek all remedies as allowed by law.

226. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Kentucky State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

227. Moreover, many of the injuries flowing from the defective engine calibration cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time. Any limitation on Kentucky State Class members' remedies would be insufficient to make them whole.

228. Finally, because of Defendants' breach of warranty as set forth herein, Kentucky State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

229. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, and related aftertreatment components.

230. As a direct and proximate result of Defendants' breach of express warranties, Kentucky State Class members have been damaged in an amount to be determined at trial.

**b. <u>KENTUCKY COUNT II:</u>**
**<u>Breach of Implied Warranty of Merchantability</u>**
**<u>Ky. Rev. Stat. §§ 355.2-314 and 355.2A-212</u>**

**(On Behalf of the Kentucky State Class)**

231. Plaintiff Happycat Transport LLC (hereinafter referred to in this Count as "Plaintiff") re-alleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

232. Plaintiff brings this Count on behalf of itself and the Kentucky State Class against all Defendants.

233. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of vehicles under § 355.2-103(1)(d).

234. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

235. The Class Trucks are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

236. Warranties that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Ky. Rev. Stat. §§ 355.2-314 and 355.2A-212.

237. Defendants' warranties were made for the benefit of Plaintiff and Class members as the ultimate end user of the Class Trucks.

238. Defendants made representations to Plaintiff and Class members regarding the limited warranties applicable to their Class Trucks.[62]

239. These Class Trucks, when sold or leased and at all times thereafter, were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, Defendants installed defective engine control software that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, and related aftertreatment components, reduced vehicle reliability, increased operating and maintenance costs, and created a safety risk.

[62] *See supra* note 58.

240. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, and related aftertreatment components.

241. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Kentucky State Class members have been damaged in an amount to be proven at trial.

### 3. Oklahoma

#### a. OKLAHOMA COUNT I: Violations of the Oklahoma Consumer Protection Act Okla. Stat. Ann. tit. 15, § 751, *et seq.*

**(On Behalf of the Oklahoma State Class)**

242. Plaintiff Charles Floyd (hereinafter referred to in this Count as "Plaintiff") re-alleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

243. Plaintiff brings this Count on behalf of himself and the Oklahoma State Class against all Defendants.

244. Defendants, Plaintiff, and the Oklahoma State Class are "persons" within the meaning of Okla. Stat. Ann. tit. 15, § 752.

245. Defendants, Plaintiff, and the Oklahoma State Class engaged in "consumer transactions" within the meaning of Okla. Stat. Ann. tit. 15, § 752.

246. The Oklahoma Consumer Protection Act ("Oklahoma CPA") makes unlawful "a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction." Okla. Stat. Ann. tit. 15, § 753(5). Defendants participated in misleading, false, or deceptive acts that violated the Oklahoma CPA. By failing to disclose and by actively concealing the defects identified herein, marketing the Class Trucks as reliable, durable, and of high quality, and by presenting themselves as reputable manufacturers that valued performance, reliability, and durability, and stood behind the Class Trucks after they were sold, Defendants engaged in deceptive business practices prohibited by the Oklahoma CPA.

247. In the course of their business, Defendants concealed and suppressed material facts concerning the Class Trucks. Defendants accomplished this by (a) installing a defective engine calibration, misrepresenting the Class Trucks' engine performance, safety, and the reliability and durability of the Class Trucks' aftertreatment system, and omitting and concealing the defect from Plaintiff and the Classes and/or (b) knowingly and intentionally omitting that Field Service Campaign D25M3 would negatively impact the Class Trucks' fuel efficiency, performance, durability, and reliability.

248. Oklahoma State Class members had no way of discerning that Defendants' representations were false and misleading because the Oklahoma State Class did not have access to Defendants' design, calibration, validation, and testing of engine control software, engine performance, and aftertreatment system in the Class Trucks.

249. Defendants thus violated the Oklahoma CPA by, at minimum: representing that Class Trucks have characteristics, uses, benefits, and qualities which they do not have; representing that Class Trucks are of a particular standard, quality, and grade when they are not;

advertising Class Trucks with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Class Trucks has been supplied in accordance with a previous representation when it has not.

250. Defendants intentionally and knowingly misrepresented material facts regarding the Class Trucks with intent to mislead the Oklahoma State Class.

251. Defendants knew or should have known that their conduct violated the Oklahoma CPA.

252. Defendants' fraudulent concealment of the Class Trucks' true performance, fuel efficiency, regeneration frequency, operating costs, reliability, durability, and safety was material to the Oklahoma State Class.

253. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Oklahoma State Class.

254. Defendants' violations present a continuing risk to the Oklahoma State Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

255. Members of the Oklahoma State Class suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and concealment of and failure to disclose material information. Defendants had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Oklahoma CPA. All owners of Class Trucks suffered ascertainable loss as a result of Defendants' deceptive and unfair acts and practices made in the course of Defendants' business.

256. As a direct and proximate result of Defendants' violations of the Oklahoma CPA, Oklahoma State Class members have suffered injury-in-fact and/or actual damage.

257. Pursuant to Okla. Stat. Ann. tit. 15, § 761.1, the Oklahoma State Class seeks to recover actual damages in an amount to be determined at trial; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Okla. Stat. Ann. tit. 15, § 761.1.

**b. OKLAHOMA COUNT II:**
**Breach of Express Warranty**
**Okla. Stat. Ann. tit. 12A, §§ 2-313 and 2A-210**

**(On Behalf of the Oklahoma State Class)**

258. Plaintiff Charles Floyd (hereinafter referred to in this Count as "Plaintiff") realleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

259. Plaintiff brings this Count on behalf of himself and the Oklahoma State Class against all Defendants.

260. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Ann. tit. 12A, §§ 2-104 and 2A-103, and "sellers" of motor vehicles under § 2-103.

261. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Ann. tit. 12A, § 2A-103(q).

262. The Class Trucks are and were at all relevant times "goods" within the meaning of Okla. Stat. Ann. tit. 12A, §§ 2-105 and 2A-103(h).

263. In connection with the purchase or lease of the Class Trucks, DTNA and Western Star provide a limited warranty which covers defects in material and/or workmanship within the warranty period. Detroit Diesel provides an engine warranty for 2 years (unlimited miles).

264. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

265. Defendants' warranties were made for the benefit of Plaintiff and Class members as the ultimate purchaser of the Class Truck. Plaintiff relied on the representations made regarding Defendants' warranties when he purchased his Class Truck.[63]

266. Despite the existence of warranties, Defendants failed to inform Oklahoma State Class members that the Class Trucks were defectively designed because they were equipped with the dangerous engine calibration defect that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, and related aftertreatment components, reduced vehicle performance, reliability, and durability, and increased operating and maintenance costs, and Defendants failed to adequately remedy the defect and resulting aftertreatment system damage free of charge.

267. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects and are unable to do so without negatively affecting the performance of the Class Trucks.

268. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

269. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Oklahoma State Class members whole and because

[63] *See supra* note 58.

Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

270. Accordingly, recovery by Plaintiff and Oklahoma State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

271. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiff and Oklahoma State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

272. Moreover, many of the injuries flowing from the defective engine calibration cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of Defendants' failure and/or continued failure to provide such limited remedy within a reasonable time. Any limitation on Oklahoma State Class members' remedies would be insufficient to make them whole.

273. Finally, because of Defendants' breach of warranties as set forth herein, Plaintiff and Oklahoma State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

274. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, and related aftertreatment components.

275. As a direct and proximate result of Defendants' breach of express warranties, Oklahoma State Class members have been damaged in an amount to be determined at trial.

### c. OKLAHOMA COUNT III: Breach of Implied Warranty of Merchantability Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212

**(On Behalf of the Oklahoma State Class)**

276. Plaintiff Charles Floyd (hereinafter referred to in this Count as "Plaintiff") realleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

277. Plaintiff brings this Count on behalf of himself and the Oklahoma State Class against all Defendants.

278. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Ann. tit. 12A, §§ 2-104 and 2A-103, and "sellers" of motor vehicles under § 2-103.

279. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Ann. tit. 12A, § 2A-103(q).

280. The Class Trucks are and were at all relevant times "goods" within the meaning of Okla. Stat. Ann. tit. 12A, §§ 2-105 and 2A-103(h).

281. A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Okla. Stat. Ann. tit. 12A, §§ 2-314 and 2A-212.

282. These Class Trucks, when sold or leased and at all times thereafter, were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, Defendants installed a defective engine calibration that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, and related aftertreatment components, reduced vehicle reliability, increased operating and maintenance costs, and created a safety risk.

283. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, and related aftertreatment components.

284. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Oklahoma State Class members have been damaged in an amount to be proven at trial.

**4. Pennsylvania**

**a. PENNSYLVANIA COUNT I:**
**Breach of Express Warranty**
**13 Pa. Cons. Stat. §§ 2313 and 2A210**

**(On Behalf of the Pennsylvania State Class)**

285. Plaintiff Happycat Transport LLC (hereinafter referred to in this Count as "Plaintiff") realleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

286. Plaintiff brings this Count on behalf of itself and the Pennsylvania State Class against all Defendants.

287. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(c), and "sellers" of motor vehicles under § 2103(a).

288. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

289. The Class Trucks are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

290. In connection with the purchase or lease of the Class Trucks, DTNA and Western Star provide a limited warranty which covers defects in material and/or workmanship within the warranty period. Detroit Diesel provides an engine warranty for 2 years (unlimited miles).

291. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

292. Defendants' warranties were made for the benefit of Plaintiff and Class members as the ultimate end user of the Class Trucks.

293. Defendants made representations to Plaintiff and Class members regarding the limited warranties applicable to their Class Trucks. Plaintiff and Class members relied on those representations when purchasing their Class Trucks.[64]

294. Despite the existence of warranties, Defendants failed to inform Pennsylvania State Class members that the Class Trucks were defectively designed because they were equipped with the dangerous engine calibration defect that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components, reduced vehicle performance, reliability, and durability, and increased operating and maintenance costs, and Defendants failed to adequately remedy the defect and resulting aftertreatment system damage free of charge.

295. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects and are unable to do so without negatively affecting the performance of the Class Trucks.

296. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

297. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Pennsylvania State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

[64] *See supra* note 58.

298. Accordingly, recovery by Plaintiff and Pennsylvania State Class members is not restricted to the limited warranty promising to repair and correct Defendants' defect in materials and workmanship, and they seek all remedies as allowed by law.

299. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiff and Pennsylvania State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

300. Moreover, many of the injuries flowing from the defective engine calibration cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of Defendants' failure and/or continued failure to provide such limited remedy within a reasonable time. Any limitation on Pennsylvania State Class members' remedies would be insufficient to make them whole.

301. Finally, because of Defendants' breach of warranties as set forth herein, Plaintiff and Pennsylvania State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

302. Defendants were provided notice of these issues by way of a letter sent by Plaintiff and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused

from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, and related aftertreatment components.

303. As a direct and proximate result of Defendants' breach of express warranties, Pennsylvania State Class members have been damaged in an amount to be determined at trial.

### b. PENNSYLVANIA COUNT II: Breach of Implied Warranty of Merchantability 13 Pa. Cons. Stat. §§ 2314 and 2A212

**(On Behalf of the Pennsylvania State Class)**

304. Plaintiff Happycat Transport LLC (hereinafter referred to in this Count as "Plaintiff") realleges and incorporates by reference all of the foregoing paragraphs as though fully set forth herein.

305. Plaintiff brings this Count on behalf of itself and the Pennsylvania State Class against all Defendants.

306. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(c), and "sellers" of motor vehicles under § 2103(a).

307. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

308. The Class Trucks are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

309. A warranty that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

310. These Class Trucks, when sold or leased and at all times thereafter, were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, Defendants installed a defective engine calibration that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components, reduced vehicle reliability, increased operating and maintenance costs, and created a safety risk.

311. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs and through the filing of the Complaint. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

312. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Pennsylvania State Class members have been damaged in an amount to be proven at trial.

### 5. Texas

#### a. TEXAS COUNT I: Breach of Express Warranty Tex. Bus. & Com. Code §§ 2.313 and 2A.210

**(On Behalf of the Texas State Class)**

313. Plaintiffs Fire Chief Transport LLC and Christopher Price (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

314. Plaintiffs bring this Count on behalf of themselves and the Texas State Class against all Defendants.

315. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of vehicles under § 2.103(a)(4).

316. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

317. The Class Trucks are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

318. In connection with the purchase or lease of the Class Trucks, DTNA and Western Star provide a limited warranty which covers defects in material and/or workmanship within the warranty period. Detroit Diesel provides an engine warranty for 2 years (unlimited miles).

319. Defendants' warranties formed a basis of the bargain that was reached when consumers purchased or leased Class Trucks.

320. Defendants' warranties were made for the benefit of Plaintiffs and Class members as the ultimate end user of the Class Trucks.

321. Defendants made direct representations to Plaintiffs and Class members regarding the limited warranties applicable to their Class Trucks. Plaintiffs and Class members relied on those representations when purchasing their Class Trucks.[65]

322. Despite the existence of warranties, Defendants failed to inform Texas State Class members that the Class Trucks were defectively designed because they were equipped with a dangerous engine calibration defect that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, DOCs, and related aftertreatment components, reduced vehicle performance, reliability, and durability, and increased operating and maintenance costs, and Defendants failed to adequately remedy the defect and resulting aftertreatment system damage free of charge.

323. Defendants breached the express warranty promising to repair and correct Defendants' defect in materials and workmanship. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Trucks' materials and workmanship defects, and are unable to do so without negatively affecting the performance of the Class Trucks.

324. Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here.

325. Furthermore, the limited warranty promising to repair and correct Defendants' defect in materials and workmanship fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Texas State Class members whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

---

[65] *See supra* note 58.

326. Accordingly, recovery by Texas State Class members is not restricted to the limited warranty promising to repair and correct the defect in materials and workmanship, and they seek all remedies as allowed by law.

327. Also, as alleged in more detail herein, at the time Defendants warranted and sold or leased the Class Trucks, they knew that the Class Trucks were inherently defective and did not conform to their warranties; further, Defendants had wrongfully and fraudulently concealed material facts regarding the Class Trucks. Plaintiffs and Texas State Class members were therefore induced to purchase or lease the Class Trucks under false and/or fraudulent pretenses.

328. Moreover, many of the injuries flowing from the Class Trucks cannot be resolved through the limited remedy of repairing and correcting Defendants' defect in materials and workmanship as many incidental and consequential damages have already been suffered because of Defendants' fraudulent conduct as alleged herein, and because of their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Texas State Class members' remedies would be insufficient to make them whole.

329. Finally, because of Defendants' breach of warranty as set forth herein, Plaintiffs and Texas State Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to them of the purchase or lease price of all Class Trucks currently owned or leased, and for such other incidental and consequential damages as allowed.

330. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the

engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

331. As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and Texas State Class members have been damaged in an amount to be determined at trial.

**b. TEXAS COUNT II:**
**Breach of Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**

**(On Behalf of the Texas State Class)**

332. Plaintiffs Fire Chief Transport LLC and Christopher Price (hereinafter referred to in this Count as "Plaintiffs") re-allege and incorporate by reference all of the foregoing paragraphs as though fully set forth herein.

333. Plaintiffs bring this Count on behalf of themselves and the Texas State Class against all Defendants.

334. Defendants are and were at all relevant times "merchant[s]" with respect to vehicles under Tex. Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and "sellers" of vehicles under § 2.103(a)(4).

335. With respect to leases, Defendants are and were at all relevant times "lessors" of vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

336. The Class Trucks are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

337. Warranties that the Class Trucks were in merchantable condition and fit for the ordinary purpose for which vehicles are used, and conformed to the promises and affirmations of fact made on their labels, are implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

338. These Class Trucks, when sold or leased and at all times thereafter, were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, Defendants installed defective engine control software that caused excessive soot generation, excessive regeneration frequency, accelerated degradation of the DPFs, SCRs, and related aftertreatment components, reduced reliability and durability, increased operating and maintenance costs, and created a safety risk.

339. Defendants were provided notice of these issues by way of a letter sent by Plaintiffs. Defendants were also on notice of the engine calibration defect through Field Service Campaign D25M3. Alternatively, Plaintiff was excused from providing Defendants with notice because such notice would have been futile. As alleged herein, Defendants were aware of the engine calibration defect and its effects on the aftertreatment system before Plaintiff provided notice, yet Defendants failed to implement an adequate remedy for the damage caused by the defect, including the premature degradation of DPFs, SCRs, DOCs, and related aftertreatment components.

340. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Texas State Class members have been damaged in an amount to be proven at trial.

## X. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Nationwide Class and all State Classes, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

1. An order certifying the Nationwide and State Classes under the applicable provisions of Rule 23; appointing and designating the Plaintiffs to serve as representatives of the Nationwide Class and applicable State Classes; and appointing the undersigned attorneys to serve as Class Counsel;
2. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and practices alleged in this Complaint;
3. Relief in the form of a comprehensive program to fully reimburse and make whole all Class members for all costs and economic losses that resulted from the defective engine calibration and inadequate Field Service Campaign remedy, as well as any other consequential damages suffered as a result;
4. An order requiring Defendants to inspect all Class Truck aftertreatment systems for damage and to replace, at no cost to Class members, any components that have sustained damage from the defective engine calibration;
5. A declaration that Defendants are financially responsible for all Class notices and the administration of Class relief;
6. Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law, and disgorgement, in an amount to be determined at trial;
7. Compensation for diminished resale value of the Class Trucks;
8. Any and all applicable statutory and civil penalties;

9. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

10. An award of costs and attorneys' fees, as allowed by law;

11. Leave to amend this Complaint to conform to the evidence produced at trial; and

12. Such other or further relief as the Court may deem appropriate, just, and equitable.

## XI. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: November 6, 2026

Respectfully submitted,

By: */s/ Noah Rich*

Noah Rich (State Bar No. 223441)
Roland Tellis
David Fernandes
Adam Tamburelli
Michael Dobbs
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 818.986.9698
nrich@baronbudd.com
rtellis@baronbudd.com
dfernandes@baronbudd.com
atamburelli@baronbudd.com
mdobbs@baronbudd.com

Kevin Budner
Phong-Chau G. Nguyen
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
Facsimile: 415.956.1008
kbudner@lchb.com
pgnguyen@lchb.com

David Stellings
Katherine McBride
Miranda Litwak
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
Facsimile: 212.355.9592
dstellings@lchb.com
kmcbride@lchb.com

Bill Robins
ROBINS CLOUD LLP
808 Wilshire, Suite 450
Santa Monica, CA 90401
Telephone: 310-929-4200
robins@robinscloud.com

*Attorneys for Plaintiffs and the Proposed Classes*